**NOT RECOMMENDED FOR PUBLICATION**
File Name: 14a0706n.06

**Nos. 13-1164/1173/1182/1215/1216**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Sep 08, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| BABUBHAI PATEL, BRIJESH RAWAL, KOMAL | ) | COURT FOR THE EASTERN |
| ACHARYA, VIRAL THAKER, and LOKESH | ) | DISTRICT OF MICHIGAN |
| TAYAL, | ) | |
| | ) | OPINION |
| Defendants-Appellants. | ) | |

BEFORE:     COLE, Chief Judge; BOGGS and STRANCH, Circuit Judges.

**STRANCH, Circuit Judge.**  In these consolidated cases, five defendants pursue direct appeals after they were convicted by a jury and sentenced for their roles in conspiracies to commit health care fraud and to distribute prescription drugs in Detroit over a period of five years.  The leader of these conspiracies, Babubhai Patel, was a registered pharmacist and businessman who owned or controlled at least twenty pharmacies in Michigan.  He hired other pharmacists, including his co-defendants Brijesh Rawal, Viral Thaker, and Lokesh Tayal, to assist him in defrauding Medicare, Medicaid, and Blue Cross/Blue Shield of Michigan of approximately $18.9 million.  These co-conspirators unlawfully distributed millions of dosage units of controlled substances.  Komal Acharya was involved in a personal relationship with Patel and assisted him as a member of the health care fraud conspiracy.

Patel, Rawal, Thaker, and Tayal challenge the district court's denial of their motions to suppress evidence obtained through a Title III wiretap on two cell phones used by Patel. They contend that the government failed to prove necessity for the wiretaps, failed to inform the issuing court that translators would monitor the phone lines, and failed to minimize nonpertinent calls. Thaker, Tayal, and Acharya each argue that the government's evidence was insufficient to convict them. Patel challenges the procedural reasonableness of his sentence.[1] We AFFIRM the defendants' convictions and Patel's sentence.

## I. BACKGROUND

The conspiracies began in January 2006 and ended in August 2011 when Patel and his associates were arrested, effectively ending their illegal activities. The number of pharmacies controlled by Patel varied over time, and he changed their corporate structures frequently. Patel hired all of the staff and supervised the pharmacy operations.

The scheme to defraud insurers depended on the participation of physicians, pharmacists, recruiters, and patients. Patel paid cash bribes to physicians to entice them to write patient prescriptions for expensive medications and controlled substances that could be billed to Medicare, Medicaid, or private insurers through the Patel pharmacies. He paid kickbacks to managers of health-related companies so that they would send patients to his pharmacies, and he employed "marketers" to recruit "patients" directly from the streets.

---

[1]After oral argument, Rawal sought to adopt that portion of Patel's brief discussing the sentencing argument. Fed. R. App. P. 28(i). Rawal did not raise any sentencing issues in his opening or reply briefs in this court, his counsel did not mention during oral argument that any error occurred during the sentencing, and he has not explained how Patel's arguments apply to his own factual situation. Under the circumstances, Rawal's belated Rule 28(i) letter is insufficient to preserve a sentencing issue for appeal. *See United States v. Hough*, 276 F.3d 884, 891 (6th Cir. 2002); *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996).

Pharmacists facilitated the criminal activity by charging insurers for expensive medications that were ordered from wholesale distributors and held in inventory but not dispensed to patients. These surplus medications were later returned to the supplier for credit or sold on the black market. Pharmacists also billed insurers for controlled substances that the pharmacists knew were illegally prescribed. These controlled medications included hydrocodone (Vicodin, Lortab), oxycodone (Oxycontin), alprazolam (Xanax), and codeine-infused cough syrup. When filling prescriptions, the pharmacists usually "shorted" the number of dosage units placed in the medication vials for patients, billed the insurers for the full drug quantities prescribed, and then sold the excess pills on the street.

A significant portion of the prescription fraud was perpetrated through Visiting Doctors for America (VDA), a physician group that purported to provide home doctor visits to patients. Marketers recruited "patients" from homeless shelters and soup kitchens by offering them small amounts of cash or controlled substances. The marketers transported the "patients" to a VDA physician, who performed cursory examinations of the "patients" while they sat together in one room. VDA staff provided the co-conspirators with dummy patient files and blank prescription pads previously signed by a physician or physician's assistant. Mehul Patel and later Arpit Patel, neither of whom is a physician, wrote prescriptions for controlled medications and expensive non-controlled medications on these blank, pre-signed prescription pads. The prescriptions were taken to the Patel pharmacies, where the pharmacists used the dummy patient files to enter patient profiles into the computer database, billed for all of the medications prescribed, but filled only the controlled medications. The controlled substances were then distributed, or sold on the street.

Patel paid his pharmacists salaries, bonuses, and twenty percent of pharmacy profits to encourage them to engage in fraudulent practices. The pharmacies distributed nearly 500,000 dosage units of Schedule II controlled substances (including oxycodone), approximately 4.9 million dosage units of Schedule III controlled substances (including hydrocodone), nearly 2.3 million dosage units of Schedule IV controlled substances (including alprazolam), and approximately 2.5 million dosage units of Schedule V controlled substances. Between 2006 and 2011, the Patel pharmacies billed Medicare approximately $37,770,557; Medicaid approximately $23,134,691; and Blue Cross/Blue Shield of Michigan approximately $6,359,872.

Babubhai Patel was convicted of health care fraud conspiracy in violation of 18 U.S.C. § 1349 (count 1), drug conspiracy in violation of 21 U.S.C. § 846 (count 15), ten counts of aiding and abetting health care fraud in violation of 18 U.S.C. § 1347 & § 2 (counts 2–5, 7–9, 12–14), and fourteen counts of aiding and abetting the unlawful distribution of controlled substances in violation of 21 U.S.C. § 841(a)(1) & 18 U.S.C. § 2 (counts 20–32, 34). He was acquitted on three counts of aiding and abetting health care fraud (counts 6, 10–11) and five counts of aiding and abetting the unlawful distribution of oxycodone and hydrocodone (counts 16–19, 33). The district court sentenced him to a total term of imprisonment of 204 months, supervised release of three years, and payment of restitution in the total amount of $18,955,869.

Brijesh Rawal was convicted of health care fraud conspiracy (count 1), drug conspiracy (count 15), one count of aiding and abetting health care fraud (count 5), and three counts of aiding and abetting unlawful distribution of controlled substances (counts 24–26). The district court sentenced him to a total term of imprisonment of 68 months, supervised release of three years, and payment of restitution in the amount of $1,761,217.

Viral Thaker was convicted of health care fraud conspiracy (count 1), drug conspiracy (count 15), two counts of aiding and abetting health care fraud (counts 10–11), and two counts of aiding and abetting unlawful distribution of controlled substances (counts 30–31). The district court sentenced him to a total term of imprisonment of 24 months, no supervised release with immediate deportation, and payment of restitution in the amount of $215,053.

Lokesh Tayal was convicted of health care fraud conspiracy (count 1) and drug conspiracy (count 15). The district court sentenced him to a total term of imprisonment of 68 months, no supervised release with immediate deportation, and payment of restitution in the amount of $3,658,174.

Komal Acharya was convicted of health care fraud conspiracy (count 1). The district court sentenced her to a term of three years of probation and restitution in the amount of $500,000.

We have jurisdiction of these appeals pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## II. ANALYSIS

### A. Denial of the motion to suppress evidence

Defendants Patel, Rawal, Thaker, and Tayal challenge the district court's denial of their motions to suppress evidence obtained through the Title III wiretap, as well as all fruit of that evidence. In examining the denial of a motion to suppress, we review the district court's factual findings for clear error and its conclusions of law *de novo*. *United States v. Poulsen*, 655 F.3d 492, 503 (6th Cir. 2011). "It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003)

(quoting *United States v. Feldman*, 606 F.2d 673, 679 n.11 (6th Cir. 1979)); *United States v. Giacalone*, 853 F.2d 470, 482 (6th Cir. 1988); *United States v. Smith*, 783 F.2d 648, 650 (6th Cir. 1986). The defendant who requests suppression bears the burden of production and persuasion. *United States v. Chaar*, 137 F.3d 359, 363 (6th Cir. 1998); *Giacalone*, 853 F.2d at 482. We consider the evidence in the light most favorable to the government. *Rodriguez-Suazo*, 346 F.3d at 643.

### 1. Title III's necessity requirement

Congress granted statutory authority for law enforcement interception of private telephone conversations when it passed Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20. The statute permits a federal judge to issue a wiretap order if the government establishes, in addition to specified probable cause requirements, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous," and that the wiretap application includes "a full and complete statement" in that regard. 18 U.S.C. § 2518(3)(c), (1)(c); *United States v. Rice*, 478 F.3d 704, 709–10 (6th Cir. 2007); *United States v. Ogburn*, 288 F. App'x 226, 236 (6th Cir. 2008).

This provision of Title III, which is known as the "necessity" or "needs" requirement, was added to "ensure that a wiretap 'is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" *United States v. Alfano*, 838 F.2d 158, 163 (6th Cir. 1988) (quoting *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974)). Although a wiretap cannot be used as a routine initial step in criminal investigations, *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977), a wiretap does not have to be the last resort, *id.*, and "the government is not required to prove that every other conceivable method [of

investigation] has been tried and failed or that all avenues of investigation have been exhausted," *Alfano*, 838 F.2d at 163. "All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *United States v. Lambert*, 771 F.2d 83, 91 (6th Cir. 1985).

Congress intended for courts to examine the sufficiency of the government's wiretap applications through the lenses of practicality and common sense, *Landmesser*, 553 F.2d at 20, and consequently, we give great deference to the district court's decision to grant a wiretap application, *Giacalone*, 853 F.2d at 479. Having carefully reviewed each wiretap application, and applying great deference as the law requires, the district court did not err in determining that the government sufficiently established necessity to justify wiretap interception of Patel's cell phones.

The initial wiretap application and each of the six extension applications were supported by agent affidavits describing numerous law enforcement investigative techniques that were considered or used to infiltrate Patel's organization. These affidavits explained at length both the progress achieved and the obstacles encountered in using confidential informants, undercover agents, audio and video recordings, surveillance, pole cameras, consensual telephone calls, pen registers, toll records, trash pulls, search warrants, and interviews. The affidavits explained in depth why ordinary methods of investigation failed to achieve all of law enforcement's objectives, why other methods were contemplated but determined to be unlikely to succeed if attempted, and why certain methods would be likely to alert the co-conspirators to the ongoing investigation. Wiretap interception of communications was necessary to penetrate the conspiracies in order to learn the following: the extent of Patel's organization; the names and

roles of recruiters, pharmacists, doctors, and other medical professionals and companies involved in the scheme; Patel's money laundering methods; and Patel's methods for concealing the activities of his organization.

Each wiretap application supplied more than sufficient factual information to permit the district court to decide whether a Title III wiretap was necessary to the ongoing investigation. We have no concern that the wiretap was used as a routine first step in a criminal investigation that could have utilized only traditional investigative techniques to expose the crime. *See Kahn*, 415 U.S. at 153 n.12; *Alfano*, 838 F.2d at 163; *Landmesser*, 553 F.2d at 20. In addition, the continuing need for wiretap interception was thoroughly established in the extension applications. *See United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000). Because the district court's decisions to approve the wiretap applications were amply supported by the showing of necessity and those decisions are entitled to deference, we affirm on this issue. *See Giacalone*, 853 F.2d at 479; *Alfano*, 838 F.2d at 163; *Lambert*, 771 F.2d at 91.

*2. The minimization requirement*

Title III requires law enforcement agents executing a wiretap order "to minimize the interception of communications not otherwise subject to interception under this chapter . . . . In the event the intercepted communication is in a code or foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception." 18 U.S.C. § 2518(5). The same subsection of the statute provides that "[a]n interception under this chapter may be conducted in whole or in part by Government personnel, or by an individual operating under a contract with the Government, acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception." *Id.*

The defendants sought suppression of evidence obtained through the wiretaps on the ground that the agents failed to comply with the minimization requirements. First, they contend that the government failed to disclose to the district court, upon seeking the initial wiretap authorization order, that intercepted calls would be monitored primarily by foreign language translators and not by federal drug agents. Second, they argue that the translators did not properly minimize the intercepted, non-pertinent calls, and drug agents failed to provide proper instruction and supervision. Third, Patel argues that all of his calls with his attorneys were intercepted.

### a. Interception of calls by translators

The government does not deny that its agents knew before applying for the wiretap order that most of the intercepted conversations would be spoken in a Hindu dialect. Within hours after the district court issued the initial wiretap authorization order on January 10, 2011, the wiretaps were in place and translators were situated at the monitoring stations listening to the intercepted calls under the supervision of a law enforcement agent. The government informed the district court about the large volume of foreign language calls and the use of translators in the first 10-day report submitted to the court. The government repeated the same disclosure in the first wiretap extension application submitted to the court on February 8, 2011.

The government argues that it was not required to obtain court preauthorization to use translators during call interception because § 2518(5) expressly states that "[a]n interception . . . may be conducted in whole or in part by Government personnel, or by an individual operating under a contract with the Government, acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception." Congress added this language to the statute in 1986 "to free field agents from the relatively routine activity

of monitoring interceptions so that they can engage in other law enforcement activities." S. Rep. No. 541, *reprinted in*, 1986 U.S.C.C.A.N. 3555, 3585. Had Congress wanted to impose a requirement that the government notify the court about the use of translators, the government contends, Congress could have included it in the "full and complete statement" mandate of § 2518(1). Congress did not do so, leading to the inference that the statute does not require notice to the court in the wiretap application of the intended use of translators to monitor intercepted telephone calls. Because the translators provided services to the government under contract and because they were directly supervised by a law enforcement agent present at the monitoring stations, the government asserts that no violation of the wiretap statute occurred to warrant suppression of the evidence obtained through call interception.

The defendants rely on a First Circuit case, *United States v. Lopez*, 300 F.3d 46, 55 (1st Cir. 2002), which held "that the government must disclose, as a part of its application for a wiretap warrant, any intention to utilize the services of civilian monitors in the execution of the warrant." In that case, the government relied on civilian monitors working under contract with the government to listen to intercepted calls, perform minimization, and provide some translation services. *Id.* at 50. The First Circuit reasoned that § 2518(1) placed on the government a duty of candor to the tribunal to make a "full and complete" disclosure in the wiretap application of the intended use of civilian monitors. Nonetheless, the First Circuit upheld the wiretap in that case because it was conducted in a manner that preserved the core protective purposes of Title III. *Id.* at 56. In the twelve years since *Lopez* was decided, only one other federal circuit has cited the case and did so for a point not relevant here. *See United States v. Yarbrough*, 527 F.3d 1092, 1098 (10th Cir. 2008).

We conclude that the statutory language controls over the *Lopez* opinion. *See Bates v. United States*, 522 U.S. 23, 29 (1997) ("The text of [the statute] does not include an 'intent to defraud' state of mind requirement, and we ordinarily resist reading words or elements into a statute that do not appear on its face"). The statute allows a wiretap to be conducted by "Government personnel," which may include both law enforcement agents and civilians employed by the government. The statute also permits the wiretap to be conducted by "an individual operating under a contract with the Government" as long as that person is supervised by a law enforcement officer who is authorized in the wiretap order to intercept communications. The statute does not require the "individual" working under contract to be a law enforcement agent. Further, the statute does not state that translators are authorized to intercept and translate only foreign language calls, as Patel argues. Finally, the statute does not require the government to disclose the planned use of translators to the authorizing court at the time wiretap authorization is sought.

Even the *Lopez* court recognized that whether civilian monitors are employed does not "affect the likelihood that the wiretap would be authorized in the first place" nor does "it increase the wiretap's intrusion on privacy interests." *Lopez*, 300 F.3d at 55. Here, the primary purposes of Title III were not frustrated by using qualified foreign language translators to understand the substance of the calls intercepted. *Id.* A wiretap would be meaningless if English-speaking monitoring agents could not understand the communications taking place between co-conspirators. And while encouraging government candor to the court is certainly a worthy objective, in this case the government disclosed to the court ten days after the wiretap began that most of the intercepted calls were spoken in Hindu dialect and that translators were necessary to help the government understand the communications. There is no indication that an agent

provided a false affidavit to the court to obtain wiretap authorization, as was the case in *United States v. Rice*, 478 F.3d 704, 707, 710–11 (6th Cir. 2007).

In making its oral ruling on the motion to suppress, the district court stated, "I think there has to be some showing of deliberate violation of the rules." Although the defendants now challenge that standard as applied by the district court, the comment appears to have been drawn from *Lopez*, where the First Circuit ultimately decided that the government's violation in failing to give notice of civilian monitors had not been knowing and willful. *See Lopez*, 300 F.3d at 56. We apply our own law in affirming the district court's finding that the defendants did not carry their burden to show a violation of § 2518(5). *See Rodriguez-Suazo*, 346 F.3d at 643; *Chaar*, 137 F.3d at 363.

### b. Minimization of nonpertinent calls, including privileged calls

Section 2518(5) requires that electronic surveillance "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . . ." In analyzing under the Fourth Amendment the reach of governmental intrusions into personal privacy, the Supreme Court has "undertaken an objective assessment of an officer's actions in light of the facts and circumstances then known to him." *Scott v. United States*, 436 U.S. 128, 137 (1978). The Fourth Amendment "itself proscribes only 'unreasonable' searches and seizures," *id.*, and in *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968), "the Court emphasized the objective aspect of the term 'reasonable.'" *Scott*, 436 U.S. at 137.

In applying "reasonableness" in the wiretap context, the focus must be "on the agents' actions not their motives." *Id.* at 139. And "[b]ecause of the necessarily ad hoc nature of any determination of reasonableness, there can be no inflexible rule of law which will decide every case." *Id.* The wiretap statute "does not forbid the interception of all nonrelevant conversations,

but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." *Id.* at 140. Whether the agents have complied with the minimization requirement "will depend on the facts and circumstances of each case." *Id.*

Here, the defendants initially challenged the monitors' performance in minimizing calls by gathering a random sample of the intercepted calls and suggesting that the percentage of intercepted nonpertinent calls was too high and that the percentage of minimized calls was too low. But "blind reliance on the percentage of nonpertinent calls intercepted is not a sure guide to the correct answer." *Scott*, 436 U.S. at 140. While percentages may be helpful,

> there are surely cases, such as the one at bar, where the percentage of nonpertinent calls is relatively high and yet their interception was still reasonable. The reasons for this may be many. Many of the nonpertinent calls may have been very short. Others may have been one-time only calls. Still other calls may have been ambiguous in nature or apparently involved guarded or coded language. In all these circumstances agents can hardly be expected to know that the calls are not pertinent prior to their termination.

*Id.*

A more useful approach than percentages, the Supreme Court explained in *Scott*, is to consider the circumstances surrounding the wiretap. *Id.* When agents are investigating what is "thought to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise. And it is possible that many more of the conversations will be permissibly interceptible because they will involve one or more of the co-conspirators." *Id.* During the early stages of wiretapping, "agents may be forced to intercept all calls to establish categories of nonpertinent calls which will not be intercepted thereafter." *Id.* at 141. Interception of those same kinds of calls may be unreasonable later, after the non-pertinent categories of calls have been identified. *Id.* Agents who listen to one-time conversations that defy categorization do not violate the minimization requirement, and other scenarios may come

up "where patterns of nonpertinent calls do not appear. In these circumstances it may not be unreasonable to intercept almost every short conversation because the determination of relevancy cannot be made before the call is completed." *Id.* at 141–42.

In *Scott*, the Supreme Court found no Fourth Amendment violation where forty percent of the intercepted calls were "clearly narcotics related" and where many of the remaining calls were "very short." *Id.* In a case presenting a "wide-ranging conspiracy with a large number of participants, even a seasoned listener would have been hard pressed to determine with any precision the relevancy of many of the calls before they were completed." *Id.* at 142. Further, a large number of calls were ambiguous, "making characterization virtually impossible until the completion of these calls." *Id.*

In applying *Scott's* principles of reasonableness in the minimization of wiretapped calls, we consider three factors: "the nature and scope of the criminal investigation; the Government's reasonable expectations of the character of conversations; and, the extent of judicial supervision over the surveillance." *United States v. Feldman*, 606 F.2d 673, 678 (6th Cir. 1979) (and cases cited therein). Defendants must carry the burden to establish that "the monitoring agents exhibited a high disregard for appellants' privacy rights or that they did not do all they reasonably could to avoid unnecessary intrusions." *Id.* at 679. "It is not enough for the defendants to identify particular calls which they contend should not have been intercepted; they must establish a pattern of interception of innocent conversations which developed over the period of the wiretap." *United States v. Lawson*, 780 F.2d 535, 540 (6th Cir. 1985).

The defendants did not carry their burdens of production and of persuasion to show that the government failed to comply with the minimization requirements. *See Giacalone*, 853 F.2d at 482. Although the district court held an evidentiary hearing at the defendants' request, DEA

Agent Parkison's testimony at the hearing supported the government's position, and the defendants did not present any contradictory evidence.

Agent Parkison informed the wire monitors about their responsibility to minimize calls that did not relate to the investigation or that were covered by the attorney-client privilege. He required them to discuss their minimization duties with a federal prosecutor before intercepting any calls. A law enforcement agent was present in the monitoring room at all times to supervise the wiretap and answer any questions of the translators about minimizing phone calls.

The monitors intercepted business calls to and from Patel because these calls were either blatantly incriminating—Patel was bribing doctors or discussing drugs that had been billed for but not dispensed—or Patel was discussing conspiracy-related matters, such as meeting with doctors he was recruiting into the conspiracy or opening and closing pharmacies. The monitors also intercepted calls pertaining to Patel's assets, including his many discussions about purchasing gas stations, motels, and other property, because the investigators were tracking money laundering. The monitors listened to certain calls concerning Patel's family because at least one family member was involved in the conspiracy and because Patel held $600,000 in a bank account in the name of a family member. The monitors also intercepted some of Patel's personal calls if the calls also involved the conspiracies. For example, one call between Patel and Acharya included both a personal exchange and a discussion of six of Patel's corporations held in Acharya's name. Patel told Acharya that there would soon be $18 million deposited into the corporate accounts.

Early in the initial wiretap period, monitors intercepted a few calls involving non-privileged communications between Patel and his attorneys. Concerned that attorney-client privileged calls would occur in the future, the government promptly established a "filter team"

comprised of agents and a prosecutor who were not working on the Patel case. Whenever a monitor intercepted a call between Patel and an attorney, the monitor transferred the call to a filter team member and the agent assigned to the filter team made the determination whether to minimize the call under standard minimization practices. Upon minimizing a call, the recording system generated an entry, which permitted agents later to request a system report detailing which of the calls had been minimized. After each call was complete, a filter team agent accessed the call, wrote a summary of the call or transcribed it, and provided that document to the prosecutor supervising the filter team. That prosecutor, with advice from the Criminal Chief of the United States Attorney's Office, determined whether the call contained privileged attorney-client communications or whether the call should be turned over to the conspiracy investigators and prosecutors.

The establishment of the filter team was reported to the district court within the first thirty days after the wiretap began, and the court approved the procedure. None of the intercepted attorney-client calls were ever provided to the investigators and prosecutors who conducted the conspiracy investigation. Agents employed a special procedure so that privileged calls were never placed on either the evidence discs or the working copy discs given to the agents and prosecutors handling the conspiracy investigation. The parties stipulated that Patel's attorney received a disc containing a copy of all of the attorney-client privileged calls, yet Patel produced no evidence that the government filter team intercepted his calls in violation of the attorney-client privilege. He also did not dispute Agent Parkison's testimony that none of the attorney-client calls intercepted by the filter team were disclosed to the investigation team. *See United States v. Warshak*, 631 F.3d 266, 294–95 (6th Cir. 2010) ("[T]here is no indication that

the government made any direct use of the privileged communications, either at trial or before the grand jury.").

In every ten-day report provided to the court, Agent Parkison included data about the minimization rate of phone calls intercepted on Patel's phones. He testified during the evidentiary hearing that 5,952 calls were intercepted that were sixty seconds or more in length and of those, 685 calls or 11.5 percent, were minimized. The defendants did not produce any evidence to contradict Agent Parkison's testimony, despite their earlier demand for the evidentiary hearing and their strenuous argument that the wiretap was structurally flawed.

In light of this factual record, the district court did not err in ruling that the government demonstrated substantial compliance with the minimization provision of the wiretap statute and the wiretap authorization orders. The defendants did not establish that "the monitoring agents exhibited a high disregard" for their privacy rights or that the agents "did not do all they reasonably could to avoid unnecessary intrusions." *Feldman*, 606 F.2d at 679. The defendants made no showing that the agents and monitors engaged in an improper pattern of intercepting innocent conversations over the period of the wiretap. *See Lawson*, 780 F.2d at 540.

Taking all of the circumstances of the wiretap into account, the agents and the prosecutor charged with supervising the operation acted reasonably and did not violate the defendants' Fourth Amendment or statutory rights. *See Scott*, 436 U.S. at 137–40. We recognize the inherent danger in allowing government agents on a filter team to listen to a target's conversations with his attorneys without minimization. *See In re Grand Jury Subpoenas*, 454 F.3d 511, 523 (6th Cir. 2006). There was no proof presented, however, that the monitoring agents and translators failed to abide by the limitations set forth in the wiretap authorization orders. This is not a case like *United States v. George*, 465 F.2d 772, 775 (6th Cir. 1972), where

the "protective limitations" of the wiretap authorization order "were completely defeated." Moreover, the evidentiary record in this case is far different from the factual records presented to the courts in *United States v. Renzi*, 722 F. Supp. 2d 1100 (D. Ariz. 2010), and *United States v. Simels*, No. 08-CR-640, 2009 WL 1924746 (E.D.N.Y. July 2, 2009). In those cases, the district courts suppressed all evidence obtained through electronic surveillance because the proof established that agents unlawfully intercepted privileged attorney-client calls. Here, no such proof was presented. Because the district court did not err in ruling that the government met the minimization requirement of the wiretap statute, we affirm on this ground.

## B. Sufficiency of the evidence

Three defendants—Tayal, Thaker, and Acharya—challenge the sufficiency of the government's proof to convict them of various crimes. Their attacks on the evidence are without merit, and we affirm the convictions of each defendant.

The district court has authority to set aside a verdict of guilty and enter a judgment of acquittal. Fed. R. Crim. P. 29(c)(2). In reviewing the district court's decision on a motion for judgment of acquittal, we evaluate the evidence in a light most favorable to the government and decide whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Mack*, 729 F.3d 594, 603 (6th Cir. 2013). We may not reweigh the evidence, *United States v. Mathis*, 738 F.3d 719, 735 (6th Cir. 2013), and the defendant must carry a "very heavy burden" to prevail on a sufficiency challenge. *United States v. Clay*, 667 F.3d 689, 693 (6th Cir. 2012) (internal quotation marks omitted).

Any person who conspires to commit health care fraud may be convicted of a federal offense. 18 U.S.C. § 1349. An individual commits health care fraud by "knowingly and willfully execut[ing] or attempt[ing] to execute a scheme or artifice . . . to defraud any health

care benefit program[] or . . . to obtain by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services." 18 U.S.C. § 1347(a). A person who commits health care fraud "need not have actual knowledge" of the statute forbidding the conduct "or specific intent to commit a violation" of the statute. 18 U.S.C. § 1347(b). To establish the crime of conspiracy to commit health care fraud, the government must prove an agreement between two or more people to act together to commit the offense and an overt act in furtherance of that agreement. *United States v. Hunt*, 521 F.3d 636, 647 (6th Cir. 2008). The government does not have to show a formal written agreement and it is enough to convict if the government "demonstrate[s] a tacit or mutual understanding among the parties." *Id.* There is no requirement that the government present direct evidence of the conspiracy; circumstantial evidence is sufficient if a reasonable person could interpret the evidence to show participation in a common plan. *Id.*

It is also unlawful for any person to knowingly or intentionally distribute controlled substances, 21 U.S.C. § 841(a), or to conspire to commit that offense, 21 U.S.C. § 846. To prove a conspiracy to distribute controlled substances, the government must present proof beyond a reasonable doubt of an agreement to violate the drug laws and proof that each conspirator knew of, intended to join, and participated in the conspiracy. *United States v. Volkman*, 736 F.3d 1013, 1024 (6th Cir. 2013). The government is not required to prove an overt act under § 846. *United States v. Shabani*, 513 U.S. 10, 15 (1994).

Because the essence of the crime of conspiracy is agreement, the government must prove that each member of a conspiracy agreed to participate in what he knew to be a collective venture directed toward a common goal. *Id.* (internal quotation marks omitted). "A conspirator

must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Salinas v. United States*, 522 U.S. 52, 65 (1997). The conspirator may do this "in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion. One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense." *Id.*

### 1. Lokesh Tayal

Defendant Lokesh Tayal, a pharmacist, contends that the government failed to produce evidence that he voluntarily joined and participated in the conspiracies to commit health care fraud and to distribute controlled substances with the knowledge and intent to further the objectives of the conspiracies. He claims there was no evidence that he took direction from Patel with regard to filling prescriptions and distributing medications illegally. He argues that the proof that he may have filled the VDA prescriptions is not sufficient to show that he knowingly joined with Patel and others to further the two conspiracies charged in the indictment.

Tayal cannot succeed in his appeal because the evidence was sufficient to prove his involvement in both conspiracies. Arpit Patel, a pharmacy technician, told the jury that he worked with Tayal at Grand River Pharmacy for approximately three years. He observed Tayal regularly bill for expensive brand-name medications but not dispense them to patients, in order to generate a huge profit for the pharmacy. Arpit Patel knew that Tayal ordered medications from the drug supplier so that, if there were an insurance audit, the type and quantity of medications brought into stock would match the pharmacy billings. The medications that were not actually dispensed were held for a week to fifteen days and then returned to the supplier for credit.

Arpit Patel also testified that he delivered fraudulent VDA patient prescriptions to pharmacies controlled by Babubhai Patel, including the Grand River Pharmacy where Tayal worked as the pharmacist. He delivered two prescriptions for each patient. One prescribed two to three controlled medications; the other prescribed between three and six noncontrolled medications. Arpit Patel observed as Tayal created patient profiles in the computer system and billed for all of the prescriptions, but filled only the controlled medications. Tayal's initials on pharmacy documents identified him as the filling pharmacist on VDA prescriptions. For some VDA prescriptions, Tayal chose which medications to bill for, actually billed for them, and then directed Arpit Patel to write the prescriptions for those medications on a presigned, blank prescription pad.

Other evidence against Tayal included the activities of LaVar Carter, who worked as a patient recruiter. He paid $100 each to homeless or elderly people who possessed Medicare or Medicaid cards so that they would have a "doctor visit" with a VDA doctor. The doctor wrote each of these patients prescriptions for Xanax, Lortab, and codeine-infused cough syrup because those three medications were the most lucrative for Carter to sell illegally on the street. Carter faxed the patients' identification cards and their Medicare or Medicaid cards to the pharmacy. Most of the prescriptions were filled by Tayal at Grand River Pharmacy. Carter loaded the patients in a van and took them to the pharmacy so they could sign the prescription sheets. Even though the controlled substances were billed to Medicare or Medicaid, Carter also paid Tayal $150 to $200 per patient for filling the controlled substance prescriptions. Because Carter usually took ten patients at a time to Grand River Pharmacy to pick up medications, he paid Tayal $1,500 to $2,000 per visit, and there were two visits per week. Carter made $3,500 to

$5,000 each week by selling on the street, at double the pharmacy price, most of the controlled substances Tayal dispensed.

Pinakeen Patel, another pharmacist, filled in for Tayal on one occasion at Grand River Pharmacy. He noticed from the pharmacy records that Tayal billed for four medications but dispensed only three. When he asked about this practice, Tayal described it as "pushing the medication" so that the pharmacy could recover money for patient co-pays it did not receive. The fourth medication that Tayal added on to each billing was usually a psychiatric medication that cost $400 to $500.

Anish Bhavsar, a pharmacist, testified that Babubhai Patel bribed a particular physician to write fraudulent prescriptions. The doctor sent the prescriptions to two of Patel's pharmacies to be filled; one of them was Grand River Pharmacy, where Tayal worked as the pharmacist. Chetan Gujarathi, Babubhai Patel's accounting and administrative assistant, testified that he assisted Babubhai Patel in returning to the supplier $40,000 worth of medications that Tayal billed but did not dispense at Grand River Pharmacy.

Although wiretap monitors rarely intercepted communications involving Tayal, the government admitted into evidence at trial a conversation between Tayal and Babubhai Patel about an FBI raid on their associate, Marcus Jenkins, who owned a home health care business. Tayal told Patel that the FBI, the Inspector General, and the Detroit Police were there, and that all of the records were being taken but that no one had been arrested yet. After discussing fraud practices in the home health care business, Patel stated: "That's the reason, pharmacy I love it, nobody can touch." Tayal responded, "Yeah," to which Patel replied, "Nothing can happen."

Through this evidence, the government sufficiently tied Tayal to the Patel conspiracies to commit health care fraud and illegal distribution of controlled substances so that the jury could

convict him of counts 1 and 15 beyond a reasonable doubt. Circumstantial evidence proved that Tayal joined the conspiracies, that he understood the goals and objectives of the conspiracies, and that he willingly facilitated those goals and objectives. *See Salinas*, 522 U.S. at 65. Tayal himself did not have to undertake all of the acts necessary for the crimes' completion. *See id.* His conspiracy convictions must stand.

### 2. *Viral Thaker*

Viral Thaker concedes on appeal that the "Government through its witness Arpit Patel established that Viral Thaker was a pharmacist engaged in the illegal practices instituted by Babubhai Patel on a consistent basis." Appellant's Br., Doc. 54 Page ID 15 (citing R. 907 Page ID 6897–98). The trial transcript citation Thaker provided confirms that Arpit Patel testified before the jury that Thaker was his supervisor at Glendale Pharmacy, Babubhai Patel was Thaker's supervisor, Thaker engaged in fraudulent practices multiple times by billing for medications that were not dispensed to patients, and the billed-but-not-dispensed medications were stored in plastic totes and eventually returned to the supplier by Chetan Gujarathi. Thaker's only argument is that Arpit Patel could not provide an answer when asked on cross-examination why the number of controlled substance prescriptions filled at the Glendale Pharmacy doubled during the six weeks Thaker was out of the country.

In light of Thaker's concession on appeal that the government proved him guilty of the conspiracy counts, we need not detail the government's evidence against him at length. It is enough to say that the government played a videotape for the jury depicting Thaker engaged in filling illegal controlled substance prescriptions for undercover agents and a confidential informant; billing the undercover agents' Blue Cross/Blue Shield cards for those prescriptions as well as for other non-controlled drugs that were not dispensed; and providing Cialis pills to the

agents without a prescription. Other proof against Thaker included both his wiretapped conversations with Babubhai Patel and the testimony of Arpit Patel, Chetan Gujarathi, and police officer Thomas Wixon, who conducted a traffic stop of a "patient" recruiter, Leodis Elliott, and recovered from his car medications that Thaker had illegally dispensed.

Thaker's sufficiency challenge fails, and we affirm his convictions. Thaker waived any challenge to his convictions for health care fraud (counts 10–11) and unlawful distribution of controlled substances (counts 30–31) by failing to address them in his appellate brief. *See United States v. Archibald*, 589 F.3d 289, 298 n.7 (6th Cir. 2009).

### 3. Komal Acharya

The government presented sufficient evidence for the jury to convict Komal Acharya of conspiracy to commit health care fraud. Acharya concedes that Patel stored boxes of medications at her apartment that she now knows were part of the fraud scheme, Acharya's Br., Doc. 39 Page ID 24, but her defense is that she did not know before her indictment what the boxes contained. She relies on the testimony of Chetan Gujarathi, who told the jury that Acharya did not know what was inside the boxes.

The government, however, presented intercepted telephone calls between Acharya and Babubhai Patel to demonstrate that Acharya was a member of Patel's health care fraud conspiracy. On April 28, 2011, the DEA executed a delayed-notice search warrant at the apartment of Chirag Soni, who also stored boxes of billed-but-not dispensed medications for Patel. The DEA made this entry look like a break-in and theft. After Soni notified Babubhai Patel about the break-in, Patel conversed with Acharya on the phone. When Patel told Acharya that boxes had been stolen from Chirag's place, Acharya wanted to know "how" and "who" stole them. Patel named the person he suspected of committing the theft. In a later call, Acharya

asked Patel the value of the stolen medications and he told her $500,000. Acharya exclaimed, "Oh, my God. Can you not catch him?" Patel answered, "I am trying to now. I am going to search for a private detective and see how we do that and where it is." Acharya replied, "Legally you cannot do anything since there was medicine in it. Isn't it?" She also asked, "Since only he knew about it, it was from his store, wasn't it?" But Patel told her the boxes were "from all the other, all the other stores." R. 905 Page ID 6548–49, 6555–56, 6565.

Other evidence also reasonably convinced the jury that Arachya was tied to the health care fraud conspiracy. Patel deposited large sums of money into her account to support her home health care business at the same time that she stored medication boxes for him. Patel wrote checks to Acharya totaling $160,000 to pay a bonus to Brijesh Rawal. Patel used this ruse to help Rawal avoid taxes on the bonus. Acharya deposited Patel's checks in her personal account, wrote $140,000 in checks to Rawal, and kept the $20,000 difference. When Arachya was hospitalized for a medication overdose, Patel called her and asked her not to give her home address to the hospital staff. He was concerned the police would check her apartment and find the stored medications.

Acharya also knowingly acted as nominee owner for some of Patel's pharmacies and corporations. Patel instructed Chetan Gujarathi to inform Acharya that four new corporations had been formed for her and that the tax identification numbers had arrived in the mail. When a representative of Blue Cross/Blue Shield of Michigan wanted to speak to the owner of a pharmacy, Acharya contacted Gujarathi to obtain all of the documentation so that she could handle the call. During an intercepted phone call, Patel told Acharya that he had placed six businesses in her name. She asked for the information about each, including tax identification numbers, revenue, address, phone number and number of employees. Patel told her that $18

million would soon be deposited into her accounts. Acharya laughed about whether anyone would wonder how someone her age could be doing $18 million in business. She also asked Patel how much he would pay her to be a pharmacy marketer because she had already brought him five patients.

A rational jury could conclude from this evidence that Acharya understood the nature and objectives of Patel's health care fraud conspiracy, that she voluntarily joined it, and that she took numerous steps to facilitate the conspiracy's success. She provided a place to hide medications, she served as a nominee owner of several fraudulent corporations, and she was a conduit for Patel's money. The district court correctly denied her motions for judgment of acquittal during and after trial. We affirm her conviction for conspiracy to commit health care fraud.

### C. Patel's sentencing

Finally, we consider the procedural reasonableness of Patel's sentencing, an issue we review for an abuse of the district court's discretion. *See United States v. Davis*, 751 F.3d 769, 773 (6th Cir. 2014). A sentence is procedurally unreasonable if the district court improperly calculated the guideline range. *Id.* Patel points to error in the district court's attribution of an amount of loss more than $7 million but less than $20 million, thereby increasing his base offense level by 20 levels under USSG § 2B1.1(b)(1)(K) (Nov. 2010). In Patel's view, the district court's sentencing ruling was insufficient to satisfy the instruction of Federal Rule of Criminal Procedure 32(i)(3)(B) that the court, "for any disputed portion of the presentence report or other controverted matter" must "rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Neither issue compels us to reverse.

In *Rita v. United States*, 551 U.S. 338, 356 (2007), issued shortly after our decision in *United States v. White*, 492 F.3d 380 (6th Cir. 2007), the Supreme Court explained that a "sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." Where the arguments presented are "conceptually simple," the court's statement of reasons, "though brief," is legally sufficient. *Id.* In this case, Patel and the government each filed an extensive sentencing memorandum in the district court discussing the sentencing issues presented for resolution. Patel's objection to the amount-of-loss enhancement was conceptually simple and, in light of the extensive record developed over the course of a six-week jury trial, the court was not required to hear any additional evidence to resolve the factual dispute. Having read the parties' briefs and having heard oral argument at the sentencing hearing, the court simply ruled that it understood both Patel's objection and the parties' positions and that it accepted the government's position over Patel's, leaving in place the twenty-level enhancement to the base offense level. Although brief, the district court's ruling complied with *Rita* and Rule 32(i)(3)(B) because it satisfies us that the court considered the parties' arguments and had a reasoned basis for exercising decisionmaking authority.

The court's decision to overrule Patel's objection to the sentencing enhancement was not an abuse of discretion. *See Davis*, 751 F.3d at 773. The court was not required to determine the amount of the loss with precision because a reasonable estimate is sufficient. *United States v. Jones*, 641 F.3d 706, 712 (6th Cir. 2011); *United States v. Kohlbach*, 38 F.3d 832, 835 (6th Cir. 1994). The evidence demonstrated that Patel's entire relationship with VDA was fraudulent so that one hundred percent of VDA billings—approximately $2.9 million—was properly included in the amount of the loss. That amount alone added eighteen levels to the base offense level.

USSG § 2B1.1(b)(1)(J). To justify the addition of two more levels (to 20) for an amount of loss exceeding $7 million, the government was required to show only that Patel's fraud generated an additional $4.1 million in loss. USSG § 2B1.1(b)(1)(K). Where the trial evidence proved that Patel's billings to Medicare, Medicaid, and Blue Cross/Blue Shield of Michigan totaled more than $67 million, only about six percent of those billings must be fraudulent to reach the additional $4.1 million in loss. Because the trial record provided the district court with a rational basis to estimate the amount of loss between $7 million and $20 million, we find no abuse of discretion and affirm the procedural reasonableness of the sentencing calculation. *See Davis*, 751 F.3d at 773.

### III. CONCLUSION

The suppression challenge brought by Patel, Rawal, Thaker, and Tayal to the Title III wiretap interception of Patel's cell phones fails because the government showed necessity for the wiretaps, the wiretap statute permitted government use of foreign language translators to monitor intercepted calls, and the defendants did not prove that the government failed to minimize nonpertinent calls. The trial evidence was sufficient to support the convictions of Tayal, Thaker, and Acharya, and we have not identified any procedural error in Patel's sentencing. Accordingly, we AFFIRM the defendants' convictions and Patel's sentence.