RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0071p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JAMES ALVIN CHANEY, M.D. (17-6239/6351); LESA L. CHANEY (17-6167/6314); ACE CLINIQUE OF MEDICINE, LLC (17-6240/6315),

*Defendants-Appellants*.

Nos. 17-6167/6239/6240/6314/6315/6351

Appeal from the United States District Court
for the Eastern District of Kentucky at London.
No. 6:14-cr-00037—Gregory F. Van Tatenhove, District Judge.

Argued: January 16, 2019

Decided and Filed: April 11, 2019

Before: COLE, Chief Judge; SUHRHEINRICH and MOORE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Robert L. Abell, ROBERT ABELL LAW, Lexington, Kentucky, for Appellant Lesa Chaney. Christy J. Love, LOVE LAW FIRM, PLLC, London, Kentucky for Appellants James Chaney and Ace Clinique of Medicine, LLC. Amanda B. Harris, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Robert L. Abell, ROBERT ABELL LAW, Lexington, Kentucky, for Appellant Lesa Chaney. Christy J. Love, LOVE LAW FIRM, PLLC, London, Kentucky for Appellants James Chaney and Ace Clinique of Medicine, LLC. Amanda B. Harris, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Charles P. Wisdom, Jr., Roger West, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.   James Alvin Chaney ("Ace") and Lesa Chaney owned and operated a highly profitable clinic in Hazard, Kentucky called Ace Clinique of Medicine.   Eventually, the clinic attracted suspicion that it was a "pill mill":  a clinic that distributes addictive prescription pills without a legitimate medical purpose.   Law enforcement obtained a warrant and searched Ace Clinique's files, where they discovered evidence of many crimes—some related to the suspected pill-mill operation, and some distinct.   The Chaneys and Ace Clinique were charged, convicted by a jury, and sentenced.   They raise on appeal four issues:   (1) the constitutionality of the warrant that allowed the search of the clinic; (2) the sufficiency of the evidence at trial; (3) whether jury misconduct occurred and whether it warrants a new trial; and (4) whether the district court correctly calculated the guidelines range at sentencing.   For the reasons discussed below, we **AFFIRM** the district court on all grounds.

**I.  BACKGROUND**

Ace and Lesa Chaney are a married couple who owned and operated Ace Clinique of Medicine, LLC, in Hazard, Kentucky.   R. 190 (Second Superseding Indictment at 1–2) (Page ID #1877–78).   Ace was a licensed physician in Kentucky; Lesa was the President and Chief Executive Officer of Ace Clinique.   *Id.*

The government started paying attention to Ace Clinique and the Chaneys in June 2010. R. 71-2 (Warrant One at 5) (Page ID #658).   An anonymous caller contacted Chris Johnson, an investigator for the Kentucky Cabinet for Health and Family Services, and told him that Ace pre-signed prescriptions for use at Ace Clinique while absent.   *Id.*   Johnson, assisted by state law enforcement, investigated the claims.   *Id.*

The investigation revealed that Ace was out of town on the same day that several prescriptions signed by Ace and dated that day were filled at a nearby pharmacy.   *Id.* at 5–6 (Page ID #658–59).   Officers interviewed Ace Clinique employees, who admitted to using pre-

signed prescription blanks, and the employees showed the officers three partial prescription pads of pre-signed blanks. *Id.* at 6–7 (Page ID #659–60). The state officers contacted the DEA, and investigators conducted multiple interviews of people who had worked for or with Ace Clinique, as well as former patients. *Id.* at 21–37 (Page ID #674–91). The investigation led to warrants to search Ace Clinique and the Chaneys' home and airplane hangar for evidence of violations of 21 U.S.C. § 841(a)(1), which proscribes knowing or intentional distribution of controlled substances, and 18 U.S.C. § 1956(h), which proscribes conspiracies to commit money laundering. R. 71-2 (Warrant One) (Page ID #653).[1]

Eventually, a grand jury issued a 256-count indictment that charged Ace, Lesa, and Ace Clinique with various offenses. R. 190 (Second Superseding Indictment) (Page ID #1877–1920). The charges fell into three general categories: controlled substance charges (Counts 1–64), money laundering charges (Counts 65 and 235–55), and fraud charges (Counts 66–234 and 256). *See* Appellee Br. at 4–6.[2]

The defendants sought to suppress evidence seized pursuant to the warrants, but had only partial success. R. 71 (Joint Mot. to Suppress) (Page ID #611); R. 159 (May 26, 2015 Order at 24) (Page ID #1760). The evidence seized from the airplane hangar was suppressed, as was evidence seized from the clinic that dated to any time before March 2006. R. 159 (May 26, 2015 Order at 24) (Page ID #1760). The district court rejected the defendants' arguments that the warrants' enumeration of "patient files" as an item to be seized was overly broad and insufficiently particular. *Id.* at 10 (Page ID #1746).

A 25-day trial followed. Ultimately, the jury returned a mixed verdict. R. 281 (Verdict Form) (Page ID #2954–2984); *see also* Appellee Br. at 4–6.

---

[1]The description and list of items to be seized is identical in each of the three warrants, as are the portions of the affidavit discussed herein. *See generally* R. 125 (R. & R. at 3–19) (Page ID #1231–47). Therefore we do not distinguish among the warrants.

[2]Counts 69, 84, 101, 196, 205, 216, and 219 were dismissed by the government. Appellee Br. at 4–6.

The defendants argue now that the trial was infected by jury misconduct. During the trial, an alternate juror reported to court staff some "concerns about how serious[ly] the jury was taking their duty," and the staff reported those concerns to the district court. R. 371 (Sept. 30, 2016 Op. at 18) (Page ID #5925) (alteration in original) (quoting R. 291 (Apr. 20, 2016 Tr. at 3) (Page ID #3028)). The district court told the jury that if any issues related to the jury instructions arose they should report those to the court, but the court did not tell counsel that a juror had raised concerns. *Id.* at 19 (Page ID #5926). After the entry of the verdict, the same alternate juror—who did not participate in deliberations—contacted defense counsel to complain of misconduct; defense counsel contacted the court, and the court conducted an *in camera* interview with the alternate. R. 371 (Sept. 30, 2016 Op. at 20) (Page ID #5927). The defendants moved for a new trial following the interview, but the district court denied their motions. R. 297 (Mot. for New Trial [Lesa]) (Page ID #3246); R. 299 (Mot. for New Trial [Ace]) (Page ID #3279); R. 371 (Sept. 30, 2016 Op. & Order) (Page ID #5908).

Prior to sentencing, the district court conducted a two-day evidentiary hearing regarding the drug quantity and loss amount that would be used to calculate the sentencing guidelines range. R. 459 (Aug. 17, 2017 Tr. at 1) (Page ID #9443); R. 460 (Aug. 18, 2017 Tr. at 1) (Page ID #9572). Put simply, the defendants argued that drug quantity and loss amount should be calculated from the counts of conviction only; the government argued that every Schedule II or III prescription drug Ace prescribed during the relevant time period and every billing to Medicaid from Ace Clinique or a pharmacy filling an Ace Clinique prescription should be used to calculate drug quantity and loss amount. R. 460 (Aug. 18, 2017 Tr. at 44–66) (Page ID #9615–37); R. 459 (Aug. 17, 2017 Tr. at 10–11, 64–66) (Page ID #9452–53, 9506–08).

The Presentence Report ("PSR") for each defendant used the government's method to calculate a guidelines range, and the defendants objected. At sentencing, the district court refused to adopt wholesale either proposed method and instead found that 60 percent of the drugs and billings the government used to calculate drug quantity and loss amount were fraudulent. R. 508 (Sentencing Tr. at 25–29) (Page ID #10066–69). The district court varied downward from the guidelines-recommended life sentences for Ace and Lesa and sentenced Ace to a total sentence of 180 months in custody and Lesa to a total sentence of 80 months in custody. *Id.* at

86–87, 98–99 (Page ID #10126–27, 10138–39).   Ace Clinique was sentenced to five years'
probation.  *Id.* at 103 (Page ID #10143).

These appeals followed.

## II.  DISCUSSION

### A.  The Search Warrant

All defendants appeal the district court's determination that the search warrants were
constitutional.  They focus their appeals on the warrants' enumeration of "patient files" as an
item to be seized.  When considering a motion to suppress, we review a district court's legal
conclusions de novo and its findings of fact for clear error.  *United States v. Richards*, 659 F.3d
527, 536 (6th Cir. 2011).

#### 1.  Background:  The Warrant and Motions to Suppress

On September 9, 2013, the government applied for and was granted three search
warrants:  one to search the premises of Ace Clinique of Medicine, one to search James and Lesa
Chaney's home, and one to search their airplane hangar.  R. 71-2 (Warrant One) (Page ID #653);
R. 71-3 (Warrant Two) (Page ID #700); R. 71-4 (Warrant Three) (Page ID #745).  All three
warrants expressly incorporate a detailed affidavit describing Special Agent Thad Lambdin's
investigation of Ace Clinique and the Chaneys.

Each warrant contains a list of items to be seized.  The list opens with the preamble:
"The items to be seized are evidence of violations of Title 21, United States Code Sections
841(a)(1), 846 and 856, as well as Title 18 United States Code, Section 1956(h)."  R. 71-2
(Warrant One at 46) (Page ID #698).  The warrants then list various sorts of items, including
"[p]atient files for patients."  R. 71-2 (Warrant One at 47) (Page ID #699).  The agents who
executed the warrant to search the clinic seized nearly all the patient files.  R. 317 (Mar. 23, 2016
Trial Tr. at 31) (Page ID #3839).

The defendants moved to suppress evidence seized from the searches.  R. 71 (Joint Mot.
to Suppress) (Page ID #611).  They argued the warrants were insufficiently particular and were

overbroad, among other things. R. 71-1 (Mem. in Supp. of Mot. to Suppress at 19) (Page ID #635). The district court referred the motion to a magistrate judge, who recommended suppression of evidence that existed prior to March 2006 and of evidence seized from the airplane hangar, but otherwise rejected the defendants' arguments that the warrants' instruction to seize "[p]atient files" was improper. R. 125 (R. & R. at 39, 46–47) (Page ID #1267, 1274–75). The defendants entered objections to the Report and Recommendation, R. 134 (Objs. to R. & R.) (Page ID #1330), but the district court adopted the magistrate judge's recommendations. R. 159 (May 26, 2015 Order at 24) (Page ID #1760).

Among the recommendations that the district court adopted was the finding that "the facts [in the affidavit] do not support the finding that the 'whole [of Ace Clinique's] business' was fraudulent," and therefore there was not probable cause to support a general "all records" search. R. 125 (R. & R. at 38) (Page ID #1266). Naturally, the defendants did not object to this conclusion, and the district court adopted the relevant portion of the Report and Recommendation without comment. R. 159 (May 26, 2015 Order at 24) (Page ID #1760).

Although the district court did not find there was probable cause to seize all patient files, it nevertheless upheld the warrant on the theory that the preamble to the list of items to be seized acted as a limit on the list—law enforcement could seize patient files only if those files were evidence of violations of the listed statutes. R. 125 (R. & R. at 38–39) (Page ID #1266–67). This, the district court reasoned, guided the executing agents' discretion, and so the warrants passed constitutional muster.

At trial, Agent Thad Lambdin testified. The defense cross-examined him about the search of the clinic, and he explained that during the search the FBI took "not every [file], but most of them" and that the FBI intended to take all of the patient files in the clinic. R. 317 (Mar. 23, 2016 Trial Tr. at 31) (Page ID #3839). Defense counsel asked Agent Lambdin whether the FBI tried to distinguish between files that were potential evidence and files that were not; Agent Lambdin answered that the FBI "took [files] from the different areas of the clinic because [the agents] could not, on that day, determine what all was being used or not used." *Id.* at 31–32

(Page ID #3839–40).  Upon further questioning, Agent Lambdin reiterated that, at the time of the search, the FBI did not attempt to distinguish between files, but rather "just took them all."  *Id.*

The defendants renewed their motion to suppress after Agent Lambdin testified.  R. 262 (Trial Min. for Mar. 30, 2016) (Page ID #2784).  They argued that Agent Lambdin's testimony demonstrated that the "the limitation upon which the magistrate judge and the Court relied was, in fact, no limitation at all."  R. 261 (Renewed Mot. to Suppress at 3) (Page ID #2778).  The renewed motion appears to assert that the testimony showed that the warrant was insufficiently particular; the district court construed the motion to argue also that "even if the warrant itself was constitutional, the agents' supposed 'deliberate and willful disregard' of the warrant's scope requires a blanket suppression of the patient files seized in the raid."  R. 273 (Apr. 19, 2016 Op. at 3) (Page ID #2905).

The district court denied this motion because (1) agents' actions cannot affect the particularity of the warrant, which is determined by the four corners of the warrant itself; (2) the officers may not have exceeded the scope of the warrant because all patient files were potentially relevant to the alleged violations and there was no way agents in the field could have determined which files were potentially relevant evidence; and, (3) even if the search exceeded the scope of the warrant, the defendants did not argue that the patient files actually introduced at trial were beyond the scope of the warrant.  *Id.* at 3–5 (Page ID #2905–07).

The defendants now argue, on appeal, that the warrant was facially unconstitutional.

## 2.  The Search Warrant Was Constitutional

The Fourth Amendment to the United States Constitution says that "no Warrants shall issue, but upon probable cause . . . and particularly describing the place to be searched, and the persons or things to be seized."  U.S. CONST. amend. IV.  "The chief purpose of the particularity requirement [is] to prevent general searches by requiring a neutral judicial officer to cabin the scope of the search to those areas and items for which there exists probable cause that a crime has been committed."  *Richards*, 659 F.3d at 537 (alteration in original) (quoting *Baranski v. Fifteen Unknown Agents of the Bureau of Alcohol, Tobacco and Firearms*, 452 F.3d 433, 441 (6th Cir. 2006)).  The constitutionality of a warrant is determined by what is contained in the

four corners of the warrant, although the government can incorporate by express reference affidavits and other material. *See Groh v. Ramirez*, 540 U.S. 551, 557–58 (2004).

Two sorts of infirmities can lead to an insufficiently particular, and therefore unconstitutional, warrant. *Richards*, 659 F.3d at 537. The first is when a warrant provides information insufficient "to guide and control the agent's judgment in selecting what to take." *Id.* (quoting *United States v. Upham*, 168 F.3d 532, 535 (1st Cir. 1999)). The second is when the category of things specified "is too broad in the sense that it includes items that should not be seized." *Id.* This is often referred to as "overbreadth." "The degree of specificity required depends on the crime involved and the types of items sought." *United States v. Abboud*, 438 F.3d 554, 575 (6th Cir. 2006) (quoting *United States v. Blakeney*, 942 F.2d 1001, 1026 (6th Cir. 1991)) (for example, "[i]n a business fraud case, the authorization to search for general business records is not overbroad").

The appellants argue that paragraph 13 of the warrant, which lists "[p]atient files" as an item to be seized, is insufficiently particular because the government did not have probable cause to search all patient files, and the preamble clause of the warrant—limiting it to evidence of violations of 21 U.S.C. §§ 841(a)(1), 846, 856 and 18 U.S.C. § 1956(h)—is inadequate to guide the agents' discretion.

The United States presents two defenses of the warrant. First, it argues that Ace Clinique was so permeated with fraud that there was probable cause to seize all patient files. Second, it argues that the preamble clause is a sufficient limitation on the agents' discretion. The first argument fails, but the second does not.

### a. Pervasive Fraud

Although general warrants are prohibited, "'where there is probable cause to find that there exists a pervasive scheme to defraud, all the business records of an enterprise may be seized,' and consequently a description merely of records of that business will suffice" to satisfy the particularity requirement. 2 W. LaFave, Search and Seizure § 4.6(d) (5th ed. 2018) (quoting *United States v. Brien*, 617 F.2d 299, 309 (1st Cir. 1980)) (footnotes omitted). In other words, if an organization or business is permeated with fraud, then there is probable cause to believe that

all its records are instrumentalities or evidence of a crime. In those circumstances, a warrant authorizing a search of all records is not a general warrant, but rather a warrant describing exactly the items officers have probable cause to search or seize.

The court below considered and rejected the applicability in this case of the pervasive fraud doctrine. Appellee Br. at 57; R. 125 (R. & R. at 38) (Page ID #1266); R. 159 (May 26, 2015 Order) (Page ID #1737). The magistrate judge who issued the Report and Recommendation addressed this issue by first considering statements in the warrant affidavit discussing the percentage of patients who were pain patients: "The Government at times estimates 50% of Ace Clinique's patients to be legitimate. [One person] stated that she believed approximately 90% of the patient load was pain management, but [another person] estimated that number at 50-60%." R. 125 (R. & R. at 38) (Page ID #1266). Based on these numbers, the magistrate judge concluded that the "evidence does not support probable cause to find that 'the whole business is fraudulent.' Therefore, the Affidavit does not establish that Ace Clinique is 'permeated with fraud.'" *Id.* at 37–38 (Page ID #1265–66) (quoting *United States v. Roos*, No. 12-09-2-ART, 2013 WL 1136629, at *3 (E.D. Ky. March 18, 2014)). The district judge adopted this aspect of the Report and Recommendation without comment.

To the extent that this is a question of law, we review de novo. *United States v. Ford*, 184 F.3d 566, 575 (6th Cir. 1999). To the extent that the district court's conclusion that Ace Clinique was not permeated with fraud was a finding of fact, we review for clear error; clear error occurs when, as here, the district applied an incorrect legal standard to reach the factual finding. *See United States v. Mahbub*, 818 F.3d 213, 223 (6th Cir. 2016). We discuss first the proper factors for deciding whether the pervasive-fraud doctrine applies, and then we consider whether it existed in this case.

The court below applied a standard it derived from *United States v. Roos*: the "whole business" must be fraudulent to justify an all-records search. R. 125 (R. & R. at 37) (Page ID #1265) (quoting *Roos*, 2013 WL 1136629, at *3). Given the focus on the alleged percentages of patients who were pain patients, it is clear that the court below understood "whole business" to mean that every transaction in which a business engages is fraudulent; otherwise, probable cause

for an all-records search would be lacking. This is an incomplete, if not erroneous, understanding of pervasive fraud. Certainly one factor in determining whether there was pervasive fraud is the amount of fraud[3], but a large quantity of fraud is neither necessary nor sufficient for the exception to apply.

First, to the extent that the magistrate judge predicated the recommendation on an understanding that, for a business to be permeated with fraud, every transaction must be fraudulent—that is not the case. That could not be the case. Even the most fraudulent of businesses might conduct a legitimate transaction from time to time.

Even if the magistrate judge's understanding was not so cramped, it erred in considering only the quantity of fraudulent business when determining whether Ace Clinique was permeated with fraud. Other factors, such as the separability of the fraudulent aspect of the business from the legitimate and the central purpose of the business, are relevant.

The first factor not considered by the district court is the separability of the fraudulent from the legitimate. A broad warrant is justified if "every aspect" of the business operation it targets is "pervaded" with fraud. *Voss v. Bergsgaard*, 774 F.2d 402, 406 (10th Cir. 1985). One guiding principle of cases applying this doctrine is whether it is possible to separate the fraudulent aspects of the business from the legitimate. If it is possible, then the business is not permeated with fraud and a broad warrant is unjustified; if it is not, then a broad warrant can stand. For example, a business "incorporated solely as a conduit for the flow of kickback monies" might be so permeated with fraud that a broad warrant would be justified. *United States v. Accardo*, 749 F.2d 1477, 1479 n.3 (11th Cir. 1985). So too a business in which "the alleged fraud supposedly infected [the business], its principals and officers, its suppliers, and numerous other individuals and businesses with whom it did or had done business . . . [and] traces of that

---

[3]At least one other circuit has said that "'pervasive fraud' does not refer to the percentage of a defendant's business that is fraudulent." *United States v. Bradley*, 644 F.3d 1213, 1259 (11th Cir. 2011). Because at least half of Ace Clinique's business was potentially fraudulent, we do not answer the question here of whether the pervasive-fraud doctrine can apply when the fraud is small but "traces of that fraud were likely to be found spread out amongst the myriad of records" in the business, as the Eleventh Circuit held in *Bradley*. *Id.* at 1259–60. In other words, although quantity of fraud is not the only factor, we need not decide here whether it is a necessary factor.

fraud were likely to be found spread out amongst the myriad of records in [the business's] possession." *United States v. Bradley*, 644 F.3d 1213, 1259–60 (11th Cir. 2011).

Conversely, we have made clear that when the fraudulent aspect of a business is separable from and unrelated to a legitimate aspect of the business, an all-records search warrant is not justified. *Ford*, 184 F.3d at 576–77 ("Even if one business carried on at a site is permeated with fraud, if other businesses run at the same site are *separable* and are not shown to be related to the suspected crime, a warrant permitting seizure of all documents at the site is not justified." (emphasis added)); *see also Voss*, 774 F.2d at 406 ("Even if the allegedly fraudulent activity constitutes a large portion, or even the bulk, of the [target business's] activities, there is no justification for seizing records and documents relating to its legitimate activities" in a case where an organization conducted fraudulent transactions on behalf of clients but also engaged in unrelated advocacy work); *United States v. Roche*, 614 F.2d 6, 7 (1st Cir. 1980) (finding an all-records search to be overbroad because it could have been limited to the automobile insurance portion of the defendant's insurance agencies).

Another guiding principle is whether "the alleged criminal activity was the 'central purpose' of the place to be searched." *United States v. Asker*, 676 F. App'x 447, 462 (6th Cir. 2017) (quoting *United States v. Rude*, 88 F.3d 1538, 1551 (9th Cir. 1996)); *United States v Logan*, 250 F.3d 350, 365 (6th Cir. 2001) (upholding a warrant because "the warrant's general nature was due to the investigators' belief that [fraudulent activity] constituted [the business's] entire operation").

Consideration of these factors harmonizes legal doctrine and common sense. If the fraudulent portion of a business is in a silo separate from the legitimate portion, then there is no probable cause to think evidence of a crime would be found in the legitimate silo. On the other hand, if half of a business's transactions are fraudulent but are interspersed with and inseparable from the records of the legitimate transactions, then it is probable that evidence of a crime would be found in any record seized. Therefore, an all-records search would be supported by probable cause. Likewise, if a business's central purpose is fraud, it is far more likely that probable cause exists to seize all records than if only a portion of the business's purpose is fraudulent.

*United States v. Roos*, on which the court below relied, does not contradict the idea that probable cause to seize all records requires consideration of both the percentage of the business that is fraudulent as well as the separability of the fraudulent aspect of the business and the purpose of the business. 2013 WL 1136629, at *3. Furthermore, *Roos* does not suggest that all, or even the vast majority, of a business's transactions must be fraudulent to support an all-records search on the theory it is pervaded with fraud.

*Roos* is, in fact, quite different from the case at bar. It did address a warrant to search a doctor's office for patient files, and Dr. Roos was prescribing prescription painkillers, but there the resemblance stops. Dr. Roos came under suspicion after the police searched the house of two people suspected of unlawfully distributing painkillers and found oxycodone prescribed by Dr. Roos and reminders for appointments with Dr. Roos. *Id.* at *1. The suspected drug dealers were in Kentucky; Dr. Roos was based in Houston, Texas. *Id.* Kentucky State Police interviewed three Kentucky residents who said they traveled to Houston to get oxycodone prescriptions from Dr. Roos. *Id.* They would either travel to Houston, be examined quickly, and get prescriptions for large amounts of painkillers, or Dr. Roos "would call in the Texas prescriptions to a Kentucky pharmacy." *Id.* at *1. Based on this evidence, the police executed a warrant for "patient files for patients who have indicated they are from Kentucky." *Id.* After the search was executed, Dr. Roos argued "that the warrant lacked probable cause because the search warrant application did not establish that her whole medical practice was fraudulent." *Id.* at *3. In response to this argument, the district court correctly distinguished Dr. Roos's situation from the cases in which an all-records search was justified because the business was permeated with fraud. For one, the warrant at issue in *Roos* was limited to the Texas doctor's files on patients from Kentucky. Furthermore, to the extent that *Roos* suggests a broader warrant would not have been justified, that has no bearing on this case. In *Roos*, the government had evidence that Dr. Roos was conspiring with patients in Kentucky to distribute drugs unlawfully. *See United States v. Roos*, No. 12-09-2-ART, 2013 WL 1136638, at *1 (E.D. Ky. Jan. 24, 2013). Even if *Roos* were binding on this court, it would not alter the outcome in this case.

Turning back to the Chaneys and the Clinique, the question remains whether there was pervasive fraud justifying an all-records search. The first relevant factor is the quantity of fraud.

The affidavit accompanying and incorporated into the warrants showed that anywhere from one half to 90 percent of its patients were pain patients—that is, *potentially* fraudulent. Next, the separability of the fraudulent from the legitimate: although it is uncontested that the clinic saw some legitimate patients, there is no indication that the pain practice was at all separate. Ace Clinique did not have a "pain clinic" separate from the rest of its practice; it was one clinic. On the other hand, there is nothing to suggest that evidence of fraud might "infect" the files of non-pain patients. Finally, the central-purpose inquiry. It cannot be said with certainty that the *central* purpose of Ace Clinique was to operate as a "pill mill." Certainly it did operate as such, but the conceded non-negligible amount of legitimate patients at least suggests a dual purpose. The evidence is close, but there is not quite enough evidence to suggest that Ace Clinique was permeated with fraud. This means that there was not probable cause to seize all of its records wholesale based on the "permeated with fraud" theory.

### b. Particularity

This leads to the government's second argument—that the warrant was limited to files that were "evidence of violations of [21 U.S.C. §§ 841(a)(1), 846, 856 and 18 U.S.C. § 1956(h)]," and therefore it was sufficiently particular. R. 71-3 (Warrant Two) (Page ID #743); Appellee Br. at 50. This is the theory under which the district court upheld the warrant. The defendants argue now that this clause did not provide any meaningful guidance to the officers executing the warrants, and so the warrants remain insufficiently particular.

There is no formula that determines whether a warrant is sufficiently particular. A sufficiently particular warrant "supplies enough information to guide and control the [executing] agent's judgment in selecting what to take." *Richards*, 659 F.3d at 537 (quoting *United States v. Upham*, 168 F.3d 532, 535 (1st Cir. 1999)). Whether this bar has been cleared is "best resolved upon examination of the circumstances of the particular case." *Logan*, 250 F.3d at 365. "[T]he degree of specificity in a warrant must be flexible, depending upon the type of items to be seized and the crime involved." *United States v. Blair*, 214 F.3d 690, 697 (6th Cir. 2000). Finally, "where a warrant adequately describes 'a category of seizable papers,' it is not lacking in specificity merely 'because the officers executing the warrant must exercise some minimal

judgment as to whether a particular document falls within the described category.'" *United States v. Bruce*, 396 F.3d 697, 709 (6th Cir. 2005), *vacated in part on other grounds*, 405 F.3d 1034 (mem.) (6th Cir. 2005) (quoting *United States v. Ables*, 167 F.3d 1021, 1034 (6th Cir. 1999)).

Furthermore, it is established law in this circuit that, in some circumstances, "[a] warrant that empowers police to search for something satisfies the particularity requirement if its text constrains the search to evidence of a specific crime." *United States v. Castro*, 881 F.3d 961, 965 (6th Cir. 2018). The defendants nevertheless persist, arguing that "where the referenced statutes are broad in scope, courts have held that the warrant contains no limitation at all and fails the particularity requirement." Lesa Chaney Br. at 34. They then argue that the statutes referenced here are so broad that they provide no meaningful guidance, and therefore the warrant is invalid. This argument, which was not made to the district court, is incorrect even if it were available to make for the first time on appeal.

First, the defendants' attack on 18 U.S.C. § 1956(h)[4] as a meaningful limit on the warrant is unavailing because it fails to view the warrant as a whole. Section 1956(h) deals with money laundering, and the defendants are correct that § 1956(h) is a broad statute that criminalizes "more than 250 predicate offenses." Lesa Chaney Br. at 35 (quoting *United States v. Santos*, 553 U.S. 507, 516 (2005)). Perhaps a warrant that described the items to be seized *only* by reference to a statute as broad as § 1956(h), and which offered the executing officers no additional guidance or details regarding the suspected criminal conduct, would fail for lack of particularity. That is not the case here, however. Instead, the warrant expressly incorporated a detailed affidavit that described the conduct at issue. Courts must take a common-sense, contextual approach when interpreting warrants. *Castro*, 881 F.3d at 965. Here, common sense dictates that the evidence of money laundering authorized by the warrant is that related to the "pill mill" operation described in the affidavit. The out-of-circuit cases cited by defendants are

---

[4]"Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." 18 U.S.C. § 1956(h). Section 1956(h) proscribes money laundering; § 1957 proscribes "[e]ngaging in monetary transactions in property derived from specified unlawful activity."

inapposite. The warrant at issue in *United States v. Roche* failed to incorporate expressly a detailed affidavit, and would have likely been saved had it done so. 614 F.2d 6, 8 (1st Cir. 1980). Similarly lacking were the warrants at issue in *United States v. Leary*, 846 F.2d 592, 604 (10th Cir. 1988), and *United States v. Spilotro*, 800 F.2d 959, 967 (9th Cir. 1986). In sum, the warrant at issue here directed the officers to seize evidence of money-laundering violations related to the pill-mill scheme described in detail and at length in the affidavit. Therefore the officers' discretion was sufficiently guided. *Cf. Andresen v. Maryland*, 427 U.S. 463, 479–82 (1976) (upholding a warrant that authorized seizure of "fruits, instrumentalities, and evidence of crime" because that phrase must be read in context with the rest of the warrant).

Moreover, even if § 1956(h) were so broad as to provide no guidance at all, three statutes remain that would limit the scope of the warrant: 21 U.S.C. §§ 841(a)(1)[5], 846, and 856[6]. These statutes are far narrower than the statute prohibiting conspiracy to commit money laundering, and therefore provide specific guidance as to what sorts of patient files were authorized to be seized—namely, those that were evidence of drug distribution. The defendants argue otherwise, mainly relying on *United States v. Lazar*, 604 F.3d 230 (6th Cir. 2010), for support, but *Lazar* addresses a different situation entirely. The warrant at issue in *Lazar* incorporated a list of patients, and that list served as a limit on the scope of the warrant. *Id.* at 236–38 (describing the warrant as including an affidavit referring to the "below listed" and "following" patients). This court held that any files seized in addition to the listed patients were beyond the scope of the warrant. *Id. Lazar* presents a very different situation from this case because the warrant was limited to specific patients. It does not stand for the proposition that any warrant ordering the seizure of patient files without a list of names is de facto unconstitutional.

The remainder of the defendants' arguments can be dealt with quickly. They rely on *United States v. Abrams* for support, and not illogically: *Abrams* does say that a warrant that allowed a seizure of all Medicare and Medicaid records from the office of doctors accused of

---

[5]"Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense . . . a controlled substance." 21 U.S.C. § 841(a)(1).

[6]21 U.S.C. 856 prohibits and penalizes "[m]aintaining drug-involved premises."

Medicare/Medicaid fraud, even though limited only by reference to a particular criminal statute, was unconstitutional.  615 F.2d 541, 542–44 (1st Cir. 1980).  *Abrams*, however, is unpersuasive.  The opinion in *Abrams* was published only four years after the Supreme Court held in *Andresen v. Maryland* that a seizure of business records was constitutional based on a warrant's language allowing seizure of listed items "together with other fruits, instrumentalities and evidence of crime."  427 U.S. at 479.  In *Abrams*, the First Circuit distinguished *Andresen* and noted that:

> Business records, although they may contain evidence of fraud, do not fall into the category of stolen or contraband goods.  The government has cited no case and we have found none in which a seizure of all records was held valid pursuant to a generally worded warrant such as we have here.  In the cases we have canvassed where a seizure of records was upheld, there has been some limitation in the warrant as to the records to be seized.

615 F.2d at 545.  Time has shown otherwise.  We have upheld numerous seizures of the majority of a person or business's records based on "generally worded warrant[s]."  In *United States v. Gardiner*, 463 F.3d 445, 471 (6th Cir. 2006), we upheld a warrant that "specifically stated the records to be seized included:  financial documents; . . . business records involving [certain of the defendants], . . . travel records; investment records; telephone records; records related to payment of personal and business expenses and cash purchases; . . . records and notes of financial transactions."  We held "the warrant stated with particularity all items to be seized" and that, because the defendant was implicated in a broad scheme, a broad warrant was justified.  *Id.*

Likewise, we have upheld warrants allowing seizure of "papers 'showing ownership and/or control' of illegal drugs," *Bruce*, 396 F.3d at 710, and "records and documents 'relating to the ownership, partnership, investment, construction and equipment costs, operating income and expenses, losses and/or distribution of income and/or profits attributable to each [restaurant franchise],'" *Asker*, 676 F. App'x at 462.  In the latter case, we noted that "[g]iven the scope of the alleged money laundering, this list is unsurprisingly large, but nonetheless tailored."  *Asker*, 676 F. App'x at 462.

So too with the Chaneys.  The warrant authorized the seizure of all "[p]atient files . . . . [p]atient lists [and] [a]ppointment books, patient profiles, receipt books, ledgers of activity, notes regarding patient information, directions to pharmacies and other related documents as it pertains

to patients," so long as those files or patient-related documents contained evidence of money laundering or drug distribution. R. 71-3 (Warrant Two) (Page ID #744). This category surely contains numerous documents, but it is nevertheless tailored: the scheme was large, and so too the quantity of files seized.

This leads to the defendants' final argument: "The government was capable of describing the patient files and records and other items to be seized with more particularity." Lesa Chaney Br. at 41. They posit limiting the warrant to (1) files of patients who had been prescribed a controlled substance, (2) files of "those 50% of patients receiving controlled substance prescriptions that the government had some basis to conclude were [not] legitimate or probably legitimate," (3) files of individuals the government had already identified as being "unlawfully prescribed medication by Dr. Chaney," or (4) files of "individuals that received controlled substance prescriptions in June 2010, that are the genesis of this case." *Id.* at 41–42.

None of these proposed formulations show that the warrant was insufficiently particular or overbroad. The final two proposed formulations restrict the warrant to a far narrower group of files than the government had probable cause to seize. It is crucial to remember that the investigation of Ace Clinique revealed both specific instances in which patients were illegitimately prescribed controlled substances *and* evidence suggesting a larger fraud (for example, a pad of pre-signed prescriptions left for use while the doctor was away). These two formulations would limit the seizure to the specific instances already identified, ignoring the probable cause to search for other instances of fraud. It would be as though the government saw a person move drugs into a suspected stash house, but could authorize a warrant for only the quantity observed rather than any drugs found within.

The third formulation—limit the seizure to "those 50% of patients receiving controlled substance prescriptions that the government had some basis to conclude were [not] legitimate or probably legitimate"—is a gross misreading of the warrant affidavit. One person told an agent that 50 or 60 percent of Ace Clinique's patients were pain patients; there was never a distinction between a legitimate 50 percent and an illegitimate 50 percent. Therefore, this would not have been a valid formulation for the warrant.

We are left with the first proposed formulation:  limit the warrant to patients who had been prescribed a controlled substance.  This does not render illegitimate the warrant because it is no more particular than the warrant issued, which authorized the officers to seize evidence of drug-distribution crimes.  It is, if anything, more broad—rather than restricting officers to only those patient files that are evidence of crimes, the defendants would authorize officers to seize every file of a person who was prescribed a controlled substance, regardless of the apparent legitimacy of the prescription.  The defendants' failure to propose a more particular warrant formulation reveals the truth of the matter here:  the warrant was as particular as was possible, in the circumstances.  "When a more specific description of the items to be seized is unavailable, a general description will suffice."  *Blakeney*, 942 F.2d at 1027.  True, this formulation required the executing agents to use their judgment to determine whether a particular file could be seized, but that is not a fatal flaw.  *See Bruce,* 396 F.3d at 710; *Ables*, 167 F.3d at 1034; *cf. United States v. Hanna*, 661 F.3d 271, 286 (6th Cir. 2011) ("We have allowed the search of electronic files beyond their titles, recognizing the risk of 'shielded' evidence otherwise.").

A final point deserves emphasis:  the defendants do not challenge on appeal the execution of the warrant.  Rather, they focus their arguments on the constitutionality of the warrant. Therefore, the manner in which the agents executed the search—namely, that they took all of the clinic's files, seemingly without review to see whether they constituted evidence of the named crimes—is of no moment.  The defendants could have objected to the introduction of specific pieces of evidence as seized beyond the scope of the warrant, and, had the district court ruled against the defendants on those objections, we could have considered that on appeal.  Those arguments, however, were not made below.  We consider only the facial constitutionality of the warrant, and on those grounds the defendants' arguments all fail.

In sum, the warrant, as written, was constitutional.

**B.  There Was Sufficient Evidence For The Jury to Convict the Defendants**

All the defendants argue that the evidence presented at trial was insufficient to sustain their convictions.  We review jury verdicts using a deferential standard:  we may "reverse a judgment for insufficiency of evidence only if, viewing the record as a whole, the judgment is

not supported by substantial and competent evidence." *United States v. Taylor*, 800 F.3d 701, 711 (6th Cir. 2015). The evidence must be "viewed in the light most favorable to the government" and "all reasonable inferences" must be drawn "in support of the jury's verdict." *United States v. Solorio*, 337 F.3d 580, 588 (6th Cir. 2003); *United States v. Stewart*, 729 F.3d 517, 526 (6th Cir. 2013). "[A] defendant claiming insufficiency of the evidence bears a very heavy burden." *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015) (quoting *United States v. Jackson*, 473 F.3d 660, 669 (6th Cir. 2007)). It must be borne in mind, however, that the government bears the burden of proof of all elements beyond a reasonable doubt, and if the evidence did not meet that burden, the jury verdict must be reversed. *United States v. Parkes*, 668 F.3d 295, 300–03 (6th Cir. 2012).

### 1. The Drug-Distribution Counts

The first group of charges at issue are the drug-distribution counts. Ace and the clinic were found guilty of multiple counts of unlawfully distributing controlled substances, namely, oxycodone and hydrocodone, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. (Lesa Chaney was not charged with these counts.) "In order to obtain a conviction under 21 U.S.C. § 841(a)(1) against a licensed physician such as defendant, the government must show: '(1) That defendant distributed a controlled substance; (2) That he acted intentionally or knowingly; and (3) That defendant prescribed the drug without a legitimate medical purpose and outside the course of professional practice.'" *United States v. Johnson*, 71 F.3d 539, 542 (6th Cir. 1995) (quoting *United States v. Varma*, 691 F.2d 460, 462 (10th Cir. 1982)).

All defendants were found guilty of one count of conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1) and 846. "To prove a drug conspiracy, the United States must establish '(1) an agreement to violate the drug laws, and (2) each conspirator's knowledge of, intent to join, and participation in the conspiracy.'" *United States v. Singleton*, 626 F. App'x 589, 595 (6th Cir. 2015) (quoting *United States v. Crozier*, 259 F.3d 503, 517 (6th Cir. 2001)).

Finally, all defendants were found guilty of two counts of maintaining drug-involved premises in violation of 21 U.S.C. § 856. "To convict a defendant on these charges, the government must prove beyond a reasonable doubt that the defendant (1) knowingly (2) maintained any place, whether permanently or temporarily, (3) for the purpose of distributing a controlled substance." *United States v. Lang*, 717 F. App'x 523, 545 (6th Cir. 2017).

### a. Unlawful Distribution of a Controlled Substance

First, Ace and Ace Clinique challenge their convictions for unlawfully distributing oxycodone and hydrocodone in violation of 21 U.S.C. § 841(a)(1) (Counts 2–62).

Ace[7] argues that the government's evidence was insufficient for two reasons. First, Ace makes much of the fact that the government's witness, Dr. Stephen Loyd, found only two prescriptions—both not pre-signed—that, in Dr. Loyd's opinion, were not justified by a patient's underlying medical condition. And those were not from the patient files listed in Counts 2–62. Ace Br. at 45. Ace points to the fact that Dr. Loyd noted the various, serious underlying conditions that Ace's patients suffered and from this Ace concludes that the government failed to show the prescriptions were issued without a legitimate medical purpose. *Id.* at 45–46. In other words, Ace argues that the existence of an underlying medical condition that would justify the prescription of a controlled substance means that the substance was, de facto, issued with a legitimate medical purpose. Ace's second argument is that, per *United States v. Binder*, 26 F. Supp. 3d 656 (E.D. Mich. 2014), the government was required to prove *through expert testimony* that Ace issued prescriptions "outside the usual course of his professional practice and for no legitimate medical purpose." Ace Br. at 44–45 (citing 21 C.F.R. § 1306.04).

Ace's arguments are incorrect. His first argument begins with a flawed premise, as the district court explained in its post-trial opinion. R. 371 (Sept. 30, 2016 Op. & Order at 4) (Page ID #5911). Ace conflates "legitimate medical purpose" with "legitimate need" or, broader still, any condition that might justify the prescription of pain pills. *Id.* But the district court explained neatly the flaw in this logic:

---

[7]Ace and Ace Clinique's arguments regarding the sufficiency of the evidence are identical, and so, for purposes of this section, "Ace" refers to Ace Chaney and Ace Clinique unless otherwise distinguished.

> Accepting the Chaneys' premise, no physician could be held criminally liable for distributing opioid prescriptions to users who incidentally carried some legitimate need for painkillers, regardless of where, why, or how those prescriptions were issued. Suppose, for example, that a physician began dispensing prescriptions for powerful narcotics to strangers on a street corner, without asking for their medical history or performing a medical examination of any kind. Under the Chaneys' proposed construction of the law, the Government could not prosecute this physician for dispensing painkillers "without a legitimate medical purpose" absent some expert testimony that proved each stranger did not have a legitimate need for the pills.

*Id.* (footnote omitted). Instead, as the word "purpose" implies, we look at a provider's reason for issuing the prescription when determining whether it was issued for a legitimate medical purpose, rather than the patient's underlying conditions. As the district court made abundantly clear, a doctor prescribing opioid painkillers to anyone walking through the door is not saved if a person happens to have an underlying condition that could justify the prescription; likewise, a doctor who acts in good faith and with all due care but nevertheless issues a prescription to a patient who was merely faking symptoms is nevertheless acting with a legitimate medical purpose. To say otherwise would be absurdity.

Other "pill mill" cases support our common-sense reading of the statute. We have upheld similar convictions based on evidence of the doctor's intent—or purpose—rather than the patient's underlying condition. *See United States v. Elliott*, 876 F.3d 855, 864 (6th Cir. 2017) (noting that "the extremely short time [the defendant] spent with patients and her knowledge of the distances they traveled to obtain prescriptions at the clinic" supported the conviction); *United States v. Guzman*, 571 F. App'x 356, 363 (6th Cir. 2014) (the fact that the defendant "met with customers on an expedited basis and issued thousands of prescriptions for narcotics, with . . . prescription forms that [the doctor] had pre-signed" supported the conviction); *United States v. Word*, 806 F.2d 658, 663 (6th Cir. 1986) (finding that "[writing] prescriptions for various individuals whom [the defendant] did not examine" is evidence of illegitimate purpose). Evidence of the circumstances surrounding a prescription allows juries to infer that a physician's purpose was something other than legitimate medical treatment; the underlying conditions a patient may have had are not dispositive. Of course, the distinction between a physician's purpose and the patient's condition collapses when a provider's reason *is* to address the patient's

need; whether that was Ace's reason for prescribing pain pills is exactly the question in this case. The jury concluded that his reasons were illegitimate, a conclusion well supported by the evidence presented at trial.

This leads to Ace's second, equally flawed, argument. Expert testimony was not necessary to show illegitimate purpose in this case. First, the law in the Sixth Circuit is clear that expert testimony is not necessary. *Elliott*, 876 F.3d at 865. Second, there was plenty of evidence from which the jury could have concluded—absent expert testimony—that Ace was operating without a legitimate medical purpose. For example, a former patient named Charles Hicks testified that he was prescribed Percocet on his first visit to the clinic; that he was physically examined only once; that after a drug screening was negative for opiates,[8] he told Ace he was only taking drugs as needed, to which Ace responded that Hicks would have to start taking the pills more regularly; that Ace *increased* the dosage of Hicks's prescription after Hicks's drug screening was negative; and that Ace suggested to Hicks he could sell his additional OxyContin for cash. R. 400 (Mar. 3, 2016 Trial Tr. at 31–45) (Page ID #6411–25). Another example is the evidence that Ace was altering urine drug screens. R. 316 (Mar. 22, 2016 Trial Tr. at 38–42) (Page ID #3724–29). This, along with the myriad evidence summarized in the district court's opinions on the defendants' motions for acquittal, shows that in this case it was entirely appropriate for a jury to determine that Ace was operating without a legitimate medical purpose. *See* R. 267 (Apr. 12, 2016 Order) (Page ID #2794); R. 371 (Sept. 30, 2016 Op. & Order) (Page ID #5908).

### b. Drug-Distribution Conspiracy

Next, the defendants argue that the evidence was insufficient to support their convictions for conspiracy to distribute Schedule II and III controlled substances in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 1).

---

[8]In this instance, a negative drug screening is a bad outcome. The idea behind the screenings is to test whether patients are actually taking the drugs they are being prescribed; thus, a positive result for opiates is the desired outcome.

Ace's argument as to this count is similar to his argument regarding Counts 2–62: he claims that the government has failed to prove an agreement to distribute controlled substances outside the usual course of professional practice and not for a legitimate medical purpose because the government did not provide expert testimony showing that all prescriptions distributed by Ace were illegitimate. Ace Br. at 47.

This count was supported by sufficient evidence for largely the same reasons that Counts 2–62 were proven. In addition, the government introduced evidence showing that Ace and Ace Clinique had a general practice of distributing medication for illegitimate purposes that went beyond the specific prescriptions charged in Counts 2–62. *See* Appellee Br. at 75–76.[9]

Lesa Chaney also challenges the jury's verdict as to Count One. She argues that the government failed "to identify even one patient that received a controlled substance prescription both outside the usual course of medical practice and for no legitimate medical purpose." Lesa Chaney Br. at 47. But this statement is, of course, incorrect. As discussed above, the government proved that 60 prescriptions were issued "outside the usual course of medical practice and for no legitimate medical purpose." Lesa was not charged in those counts, but the government offered evidence that she knew of Ace's practice of using pre-signed prescriptions and that she distributed the slips on occasion. *E.g.* R. 321 (Mar. 8, 2016 Trial Tr. at 18) (Page ID #4655); *see also United States v. Sadler*, 750 F.3d 585, 593 (6th Cir. 2014) ("The government had no obligation to produce 'direct evidence' against [the defendant], as 'guilty knowledge and *voluntary participation* may be inferred from surrounding circumstances.' Those circumstances all pointed in one direction—that this pain-treatment operation was a charade, and [the defendant] played a critical part in facilitating the charade." (quoting *United States v. Hodges*, 935 F.2d 766, 773 (6th Cir. 1991))). This was sufficient evidence to show Lesa's involvement in the conspiracy.

---

[9]Lesa, Ace, and the clinic argue that if the drug distribution and drug conspiracy counts fall, so too should the counts for maintaining drug-involved premises. But the drug distribution and conspiracy counts survive, and so too the drug-involved premises.

Lesa's final argument is that the government is attempting to turn the use of pre-signed prescriptions into a "strict liability" offense. But that is simply not the case. If that were, so a 25-day trial would not have been warranted. Rather, the government presented the use of pre-signed prescription pads in conjunction with other evidence of illegitimate purpose, all of which allowed the jury to infer malfeasance.

## 2. The Health-Care Fraud Counts

The next group of charges are the healthcare fraud counts.

All the defendants were found guilty of multiple violations of 18 U.S.C. § 1347, which proscribes knowingly and willfully executing (or attempting to execute) a scheme or artifice to defraud any health-care benefit program. This requires the government to prove that the defendants "(1) created 'a scheme or artifice to defraud' a health care program, (2) implemented the plan, and (3) acted with 'intent to defraud.'" *United States v. Bertram*, 900 F.3d 743, 748 (6th Cir. 2018) (quoting *United States v. Martinez*, 588 F.3d 301, 314 (6th Cir. 2009)). The convictions under this statute were based on the following conduct:

- Ace and Ace Clinique: medically unnecessary urine drug screens (counts 112–122); altered urine drug screens (counts 123–147); hospital visit billings (counts 150–163, 165–168, 171–171, 175, 177, 180, 182, 186, 188, 191–192); hospital visits on the high-volume day of March 19, 2013 (count 197); nerve conduction studies conducted by unqualified personnel (count 234).

- Lesa: medically unnecessary urine drug screens (counts 112–122); hospital visits on the high-volume day of March 19, 2013 (count 197); nerve conduction studies conducted by unqualified personnel (count 234).

In addition, all defendants were found guilty of conspiracy to commit health-care fraud in violation of 18 U.S.C. § 1349, and Ace and the clinic were found guilty of making false statements relating to health-care matters in violation of 18 U.S.C. § 1035. "The elements of health care fraud conspiracy under 18 U.S.C. § 1349 are (1) an agreement between two or more persons to (2) 'knowingly and willfully execute[ ], or attempt[ ] to execute, a scheme or artifice . . . to defraud any health care benefit program; or . . . to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or

payment for health care benefits, items, or services.'" *United States v. Pamatmat*, No. 17-1611, 2018 WL 6173401, at *4 (6th Cir. Nov. 26, 2018) (quoting *United States v. Patel*, 579 F. App'x 449, 460 (6th Cir. 2014)), *cert. denied*, 2019 WL 936741 (Apr. 1, 2019). To convict the defendants for false statements, "the government had to show that [their] false statements were willful and that [they] acted with intent to defraud." *United States v. Paulus*, 894 F.3d 267, 277 (6th Cir. 2018).

### a. Medically Unnecessary Urine Drug Screens

All the defendants were found guilty of health-care fraud based on administering and billing for medically unnecessary urine drug screens, and all now appeal these convictions. Urine drug screens, when properly used, are a tool to help prevent patient abuse of pain medication. Doctors can test patients for the presence of the prescribed opioid—in which case, a positive result is desired—and for the presence of illicit drugs—in which case, a negative result is required. R. 354 (Mar. 9, 2016 Trial Tr. at 11) (Page ID #5668). These tests are medically indicated only at "the right frequency" and for "the right patient." *Id.* at 12 (Page ID #5669). If a patient is high risk, screening three or four times a year would be appropriate; for low-risk patients, once a year is adequate, per guidelines. R. 244 (Mar. 9, 2016 Trial Tr. at 66–67) (Page ID #2648–49). Ace Clinique was screening patients at much more frequent intervals. *E.g.*, *id.* at 82 (Page ID #2664) (describing a low-risk patient being screened 35 times in 35 months; another low-risk patient being screened 24 times in 42 months).

Ace argues that the government has failed to prove specific intent to defraud because it relied on "generalized" expert testimony rather than patient testimony or expert testimony "sufficiently specific to the patient, date, and services in the indictment." Ace Br. at 48. He points also to testimony of an expert witness that any drug screening is generally good. In addition, Lesa argues that the government failed to prove specific intent because: (1) she is not a healthcare professional; (2) there were divergent opinions in the medical community regarding how frequently urine drug screening should be conducted, therefore; (3) "[f]or [Lesa] to be found guilty of the healthcare fraud charges regarding the urine drug screens . . . it would have to be shown that she knew better than all these medical professionals." Lesa Chaney Br. at 52–53.

These arguments all fail.

First, the specificity of the government's proof. The defendants are correct that this court has said that "[i]f expert testimony is offered in lieu of patient testimony, the expert testimony should be sufficiently specific to the patient, date, and services in the indictment, [although] the patients' names need not be specifically mentioned during the expert's testimony." *United States v. Martinez*, 588 F.3d 301, 315 (6th Cir. 2009). The problem with the defendants' argument is that the government's expert did testify specifically as to each charged count. *See* R. 244 (Mar. 9, 2016 Trial Tr. at 81–89) (Page ID #2663–71) ("These are tables that I have performed for *each* patient and to kind of document their Opioid Risk Tool and also how many urine drug screens they had per month." (emphasis added)). This accords with *Martinez*:

> [The defendant's] records for each patient named in the indictment and the claims that [the defendant] submitted for reimbursement were admitted into evidence and available for the jury to review. [A doctor] testified that he reviewed the bills [the defendant] submitted and his patient files, and concluded that the billing was "not appropriate in any fashion" and that the procedures claimed in the billing "were not medically necessary in any way." Considering the evidence that [the defendant] performed procedures and prescribed medication that expert witnesses deemed medically unnecessary, a rational jury could infer that [the defendant] knowingly devised a billing scheme with the intent to defraud.

588 F.3d at 316 (internal citations omitted).

Similarly, in this case, Dr. Parker testified that only 31 of the 311 urine drug screens performed were medically indicated, and the complete medical files were admitted into evidence. R. 244 (Mar. 9, 2016 Trial Tr. at 86, 88–91) (Page ID #2668, 2670–73). Thus, the defendants' first argument fails.

Next, the defendants argue that one expert witness, Dr. Stephen Loyd, "testified for the government that he does not have a problem with [Ace Clinique's] drug screening regimen." Ace Br. at 48. The argument seems to be that Dr. Loyd's testimony rendered it impossible to show that the drug screens were illegitimate. This, however, is untrue. First, "courts may not 'independently weigh[ ] the evidence, nor judge[ ] the credibility of witnesses.' This rule applies with equal force to the testimony and conclusions of the government's expert witnesses." *Paulus*, 894 F.3d at 275 (quoting *United States v. Talley*, 164 F.3d 989, 996 (6th Cir. 1999))

(alteration in original). We cannot now say that the jury erred by crediting Dr. Parker's assessment that the urine screens were unnecessary over Dr. Loyd's testimony.

The second problem with this argument is that it overstates Dr. Loyd's testimony. He did say that "I don't have a problem with the drug screening regimen . . . . [P]articularly [in] rural Appalachia, I'm excited when people are drug-screened." R. 415 (Mar. 15, 2016 Trial Tr. at 160) (Page ID #7732). But Dr. Loyd said also that random drug screens (which Ace did not administer) are "preferable to a drug screen every time," and he noted instances where a patient tested negative for a drug the patient ought to have had in his system (because it was prescribed) but there was no indication Ace addressed this negative result. *Id.* at 48–52 (Page ID #7620–24).

Finally, this argument ignores the evidence of altered and ineffective drug screens (a violation for which Ace was convicted separately). *See generally* Appellee Br. at 31–33. The fact that Ace was altering drug screens adds to the potential inference that he had an illegitimate purpose and intent to defraud.

Last, there is Lesa's argument that she, as a layperson, could not have committed this fraud. But this argument is hollow. It is clear that someone need not be a medical professional to commit health-care fraud. *E.g.*, *United States v. Davis*, 490 F.3d 541, 549–50 (6th Cir. 2007). As the government points out, Lesa was aware that conducting screens was part of the regular patient visits to the clinic. R. 408 (Mar. 16, 2016 Trial Tr. at 19–20) (Page ID #7061–62). She was the owner of the clinic. Most damning, she knew about the altered tests, showing she was aware that the testing protocol at the clinic was not legitimate. R. 340 (Mar. 15, 2016 Trial Tr. at 15–16) (Page ID #5486–87). The jury could have legitimately concluded that she was aware of the fraud being conducted at her place of business.[10]

### b. Making False Statements by Using Pre-Signed Prescription Pads

Next, Ace and Ace Clinique contest their convictions for violations of 18 U.S.C § 1035 for making false statements relating to health-care matters by using pre-signed prescriptions.

---

[10]Lesa makes similar, undeveloped arguments as to all of her fraud convictions. These arguments fail for the same reason—record evidence showed that Lesa was aware of the activities at the clinic, from which the jury could have inferred fraud.

They argue that the government failed to prove that Ace and the clinic intentionally hid the fact that the prescriptions were pre-signed. Ace Br. at 49. This is not so: Roy Combs, the "IT guy" at the clinic who kept the pre-signed pads, testified that Ace told him "not to tell anybody about the [the pre-signed prescriptions]. R. 321 (Mar. 8, 2016 Trial Tr. at 19–20) (Page ID #4656–57). This alone is evidence from which the jury could have concluded Ace intentionally hid the fact that the prescriptions were pre-signed.

### c. The Nerve Conduction Studies

All the defendants challenge their convictions for violating 18 U.S.C. § 1347 by fraudulently charging for nerve conduction studies. According to the government's expert witness, Dr. Earl J. Berman, a true nerve conduction study is a "complex procedure" that tells a qualified practitioner whether a nerve is damaged by generating wave forms showing "how quickly a nerve impulse flows from a designated spot to a designated electrode." R. 354 (Mar. 9, 2016 Trial Tr. at 20) (Page ID #5677). Because "certain diseases . . . have . . . a certain neuropathy," for example, "[d]iabetes has a different characteristic wave form and flow rate than something that has a mass in the spine," "the technician has got to know very precisely how to set the electrodes, and the physician has to have special training as well to understand and interpret the wave forms and the latencies." *Id.* at 20 (Page ID #5677). "Medicare requires that a technician has special training and recognition by a nationally-recognized organization, and the physician also has to have certain nationally-recognized training." *Id.* at 21 (Page ID #5678).

Combs, the IT director at Ace Clinique, performed the nerve conduction studies there. R. 321 (Mar. 8, 2016 Trial Tr. at 4) (Page ID #4641). His only qualification to do so was a "couple days"-long course he attended that was led by the inventor of the machine. *Id.* at 7 (Page ID #4644). Combs's procedure involved "a machine that had eight D batteries in it that connected to a sponge that [he] had to get wet." *Id.* at 92 (Page ID #4729). He would then "connect [the machine] to a probe with a Q-tip on the end of it. . . . And then [he] would use the Q-tip and dip it in water, and hold it to different points on the [patient's] body." *Id.* The machine would generate a current, and when the patient felt "a sensation" Combs would write down the number on the machine's dial. *Id.*

Ace and the clinic argue that there was insufficient evidence to support this conviction because there was "confusion concerning whether a nerve conduction study involves a neural scan machine or an electromyogram (EMG)." Ace Br. at 50. They argue that the machine they used—what they term a neural scan machine—was different than the complex machine Dr. Berman described, and did not require the same training. This argument fails for two reasons. First, there was no such confusion. Dr. Berman very clearly testified that the procedure he was describing was the approved procedure for nerve conduction studies and *not* limited to EMGs or machines that use needles. R. 354 (Mar. 9, 2016 Trial Tr. at 39–44) (Page ID #5696–5701). Dr. Berman did testify that he was unfamiliar with the specific machine used at Ace Clinique, but the procedure he described for nerve conduction studies is from the Medicare/Medicaid billing manual. *Id.* This leads to the second reason why the arguments of Ace and the clinic fail: Dr. Berman's familiarity with their machine and what it may or may not require in terms of training is immaterial. Dr. Berman described the characteristics of the nerve conduction study for which the clinic billed Medicare. *Id.* By using that billing code, Ace and the clinic were representing that they were performing the type of procedure Dr. Berman described. They of course were not. Thus, they committed fraud, and no attempt to create confusion about EMGs as opposed to wet Q-Tips can undermine their convictions.

Finally, Lesa asserts broadly that the government "failed in its proof." Lesa Chaney Br. at 54. The record shows, however, that Lesa knew about the fraudulent practices at the clinic and was responsible for billing and administrative procedures at the clinic. That is sufficient evidence from which a jury could have found she knew of and committed (or aided and abetted) the fraud related to the nerve conduction studies.

For the reasons stated above, there was sufficient evidence for the jury to have convicted the defendants on all counts.[11]

---

[11]Ace argues also that there was "cumulative error," and all the defendants argue that the money-laundering charges fail because the drug-distribution counts fail. Because all of the defendants' arguments regarding the drug-distribution and health-care fraud counts are rejected, the money-laundering counts stand and there was no cumulative error.

**C. Jury Misconduct**

Next, all of the defendants argue that a new trial is warranted due to alleged jury misconduct. A new trial is warranted based on juror misconduct only if the misconduct "resulted in prejudice to [the defendant]." *United States v. Bowling*, 900 F.2d 926, 935 (6th Cir. 1990). "We apply the abuse-of-discretion standard in jury-misconduct cases." *United States v. Wheaton*, 517 F.3d 350, 361 (6th Cir. 2008).

**1. Background**

The allegations of jury misconduct in this case come from one alternate juror, juror number 116. On the fifth day of trial, a court clerk told the district court that she had received from the jury administrator some information about a recent conversation between the administrator and juror 116. "The administrator told the court clerk—and the clerk then told the [district court]—that this alternate had expressed 'some frustration with the process' and 'concerns about how serious[ly] the jury was taking their duty.'" R. 371 (Sept. 30, 2016 Op. at 18) (Page ID #5925) (quoting R. 285 (Telephone Conf.) (Page ID #2988)); R. 291 (Apr. 20, 2016 Tr. at 3) (Page ID #3028)). The district court did not investigate the concerns directly, nor did it alert counsel to the concerns. Instead, it "instructed the jury that 'if any issues . . . relate[d] to the jury instructions' arose, they should 'bring those to [the Court's] attention.'" *Id.* at 19 (Page ID #5926). The district court heard nothing further during the trial.

The day after the entry of the verdict, juror 116 contacted Ace's defense counsel and left a voicemail. Defense counsel reported the message to the court, and the parties held a telephone conference the next day. *Id.*; R. 285 (Telephone Conf.) (Page ID #2988). The district court determined that the appropriate course of conduct would be to conduct an *in camera* interview with the alternate to determine whether the concerns had to do with external influences on the jury or the jury's internal decisionmaking process. R. 371 (Sept. 30, 2016 Op. at 20) (Page ID #5927).

The *in camera* interview revealed details about the initial "concerns" that the district court was told about via the court clerk and jury administrator. The first incident occurred during opening statements. R. 291 (Apr. 27, 2016 Tr. at 6) (Page ID #3031) (describing the first

incident as happening during "the first statements"). Two jurors were discussing the Chaneys' house in the jury room during a break. The alternate told them "I don't think we should be talking about that." *Id.* One of the men who was discussing the house responded by saying "[w]e can talk about it in here" and asked "who said [that we cannot]?" *Id.* The alternate said that "[t]he Judge told us we couldn't." *Id.* Then another woman agreed with the alternate and said they could not discuss the case and "[i]t's right on the wall there." *Id.* This was the incident that was reported to the court.

Juror 116 reported another incident to the jury administrator. The jury administrator told the alternate juror to "tell [the other jurors] not to do that." *Id.* at 7 (Page ID #3032). It is unclear what exactly the alternate described to the administrator. Juror 116 did, however, describe to the court what the other incidents of misconduct were in her opinion. First, jurors were saying that they did not like the way one of the attorneys was treating an "elderly lady" witness. *Id.* Next, one of the jurors "got attracted to . . . Dr. Chaney's attorney, and he made it be known." *Id.* Finally, the alternate juror said that another woman was expressing her boredom at the trial (saying, for example, "I know how many lights . . . [are] in the ceiling."). *Id.* at 8 (Page ID #3033).

Based on these incidents the defendants moved for a new trial, but their motions were denied. R. 371 (Sept. 30, 2016 Op. at 34) (Page ID #5941).

## 2. A New Trial Was Not Warranted

The defendants rely nearly exclusively on *United States v. Resko* to support their argument that the alleged juror misconduct necessitated a new trial. *See* 3 F.3d 684 (3d Cir. 1993). In *Resko*, "approximately seven days into a nine-day trial . . . a juror approached a court officer and told him that the members of the jury had been discussing the case during their recesses and while waiting in the jury room. The court officer informed the trial court of this fact, and the court informed counsel." *Id.* at 687. The trial court declined the defendants' request for individualized voir dire, and instead gave a written questionnaire to each juror asking whether they participated in discussions and, if yes, whether they had "formed an opinion about

the guilt or non-guilt of either defendant as a result of your discussions with other jurors." *Id.* at 688. All jurors answered yes to the first question and no to the second. *Id.*

On appeal, the Third Circuit held that the district court erred by failing to conduct individualized voir dire because the questionnaire left the court with "no way to know the nature of [the jurors'] discussions" and whether those discussions were prejudicial. *Id.* at 690–95.

Here, the district court acted recklessly by choosing to keep information about potential juror misconduct from defense counsel. Nevertheless, a new trial is not warranted because the post-verdict interview with juror 116 revealed there was no juror misconduct that could have warranted a new trial, and thus there was no prejudice. *See Bowling*, 900 F.2d at 935. During the *in camera* interview, the alternate described one instance of potential misconduct (deliberating before close of evidence) that occurred during opening statements and was immediately quashed by other jurors. R. 291 (Apr. 20, 2016 Tr. at 6) (Page ID #3031). The rest of the supposed "misconduct" the juror reported could be characterized as less-than-ideal behavior (commenting on the appearance of a lawyer; complaining of boredom), but nothing that would warrant a new trial. *Id.* at 7 (Page ID #3032). Simply put, juror 116 was given a chance to air all her grievances, and nothing came close to conduct that would have warranted a new trial.

The defendants attempt to inject confusion by saying that there are a number of unresolved questions. *See* Lesa Chaney Br. at 58. But those attempts are fruitless. Juror 116 was clear when she spoke with the district judge, and the nature of the supposed misconduct is clear. It is nothing that could have possibly prejudiced the defendants. In sum, the district court's decision to withhold from the defendants an allegation of juror misconduct may have been imprudent, but in this case it is clear that, even if counsel had been informed of every "incident," nothing would have even approached necessitating a new trial. Therefore we affirm the decision of the district court.

**D.  Procedural Reasonableness at Sentencing**

Finally, the defendants argue that their sentences were procedurally unreasonable because the district court failed to address their arguments for a lower drug-amount calculation and erred in calculating the loss amount.

We review factual findings at sentencing for clear error.  *United States v. Valentine*, 694 F.3d 665, 672 (6th Cir. 2012).  We review de novo the methodology the district court used to calculate loss amount.  *United States v. Washington*, 715 F.3d 975, 984 (6th Cir. 2013).

First, the defendants argue that the district court erred by failing to explain sufficiently its rejection of the defendants' method of drug amount calculation.  *See* Ace Br. at 53–54.  The district court did, however, explain its reasoning "enough to satisfy the appellate court that [it] has considered the parties' arguments and has a reasoned basis for exercising [its] own legal decisionmaking authority."  *United States v. Liou*, 491 F.3d 334, 338 (6th Cir. 2007) (quoting *United States v. Rita*, 551 U.S. 338, 356 (2007)).  This is apparent from a review of the sentencing transcript.  First, the district court explained its reasons for doubting the defendants' expert and method:

> I've read carefully the briefing that was filed, of course, listened carefully, for example, to [defense expert] Dr. Russell's testimony, the expert testimony that was raised here.  And, I mean, I think one of the problems with the expert testimony, it's clear, as I've gone back and looked at that, is that it provides kind of this narrow bit of information, but not a real complete set of information as it relates to the alleged fraud that took place in this particular case.  And I think it's very appropriate for guideline purposes to consider conduct that's much broader than simply the counts of conviction, for example, for, you know, presigned prescriptions, you know.

R. 508 (Sentencing Tr. at 15–16) (Page ID #10055–56).  Then, the court gave a lengthy explanation of its reasoning for reaching the conclusions on drug and loss amount that it did.  *Id.* at 25–29 (Page ID #10065–68).

The defendants' assertion that the district court's explanation was "very brief" or otherwise insufficient simply does not accord with reality.  Therefore, this argument fails.

Finally, the defendants argue that the district court erred in calculating the loss amount. This argument is a rehash of the previous argument. The error of which the defendants complain is the district court's decision not to adopt the findings of their expert. Again, the district court sufficiently explained its decision regarding drug and loss amount, and specifically why it did not adopt the defense expert's methodology.

The defendants claim that the district court committed procedural error, but it is clear upon examination that their true complaint is the district court's decision to reject their expert's methodology. Because the district court committed no procedural error during sentencing, this claim fails.

### III. CONCLUSION

For the reasons discussed above, we **AFFIRM** the district court's judgment regarding each defendant.